STATE, RESPONDENT, v. KEELAND ET AL., APPELLANTS.

(No. 2,688.)

(Submitted October 8, 1909. Decided October 23, 1909.)

[104 Pac. 513.]

*Criminal Law—Grand Larceny—Livestock—Corpus Delicti—
Venue—Evidence—Insufficiency— Confessions—Admissions—
Admissibility—Expert Testimony.*

Grand Larceny—Livestock—Evidence.
    1.  Section 8645, Revised Codes, declaring the stealing of any of
    the animals enumerated therein to be grand larceny, *refers* to live
    animals only; therefore, defendants, charged with stealing certain
    heifers, the carcasses of which, dressed for beef, were found concealed
    on the range, could be convicted only upon evidence showing beyond
    a reasonable doubt that they killed, or took part in killing, the ani-
    mals.

Same—*Corpus Delicti*—How Established.
    2.  The *corpus delicti* in a prosecution for grand larceny, as well as
    in all other crimes, except in cases of unlawful homicide, in which cases
    the death of the person alleged to have been killed must be established
    directly, may be proved by circumstantial evidence.

Same—Venue—Insufficiency.
    3.  Evidence *held* insufficient to show that the defendants killed the
    cattle, which were wont to range near the county and state lines and
    the carcasses of which were found concealed in a coulee, in the county
    in which the venue was laid. The venue must be proved beyond a rea-
    sonable doubt. (MR. JUSTICE SMITH dissenting.)

Same—Confessions—What does not Constitute.
    4.  Statements made by defendants at the time of their arrest, and
    not in response to questions put to them by the person arresting,
    which implied guilt and by means of which they sought by corrupt
    means to influence the person having them in charge to permit de-
    fendants to escape, had none of the attributes of a confession, and
    hence, to make them admissible in evidence, it was not necessary to
    first show that they were not induced by fear, or threats, or the
    hope of leniency.

Same—Expert Testimony—Admissibility.
    5.  The testimony of persons for many years engaged in the livestock
    business, that in their opinion the flesh of the cattle found concealed
    on the range, and with the larceny of which defendants stood charged,
    was that of animals killed and properly bled, was properly admitted,
    under section 7887, Revised Codes.

Same—Instructions—Refusal—When not Error.
    6.  The refusal of requested instructions was not error, where the
    ones given covered those refused.

*Appeal from District Court, Custer County; C. H. Loud,
Judge.*

HENRY J. KEELAND and Frank Randerhoff were convicted of grand larceny, and appeal from the judgment and from an order denying their motion for a new trial. Reversed and remanded.

For Appellants there was a brief by *Mr. Geo. W. Farr,* and *Mr. C. C. Hurley,* and oral argument by both.

They contended, *inter alia:* The *corpus delicti* in this case is the larceny of the live animals then and there being the property of Charles F. Bean; while the connection of the defendants with the meat might be sufficient proof of the *corpus delicti* of the larceny of the meat itself, if they were charged with stealing that, it cannot be of the live animals. Proof as to the larceny of the meat would not be proof of the larceny of the animals while alive. (*People* v. *Smith,* 112 Cal. 333, 44 Pac. 663; *Nightingale* v. *State,* 94 Ga. 395, 21 S. E. 221; *State* v. *Seagler,* 1 Rich. (S. C.) 30, 42 Am. Dec. 404; *People* v. *Murphy,* 47 Cal. 103; *State* v. *Alexander,* 74 N. C. 232; *Hunt* v. *State,* 55 Ala. 138; *Golden* v. *State,* 63 Miss. 466; 25 Cyc. 69.) As a part of the criminal act, and as a part of the *corpus delicti,* is the ownership of the animals in question. (*State* v. *Cardelli,* 19 Nev. 319, 10 Pac. 434.) The simple proof that certain cattle bore certain brands and that a certain man owns that brand is not sufficient proof alone of the ownership in that man of those cattle. At the most, evidence as to the brand is only a means of identification; it is not any sufficient proof of ownership. (*State* v. *Gordon,* 28 Utah, 15, 76 Pac. 882; *State* v. *De Wolfe,* 29 Mont. 420, 74 Pac. 1084; *State* v. *Hanna,* 35 Or. 195, 57 Pac. 629; 8 Encyclopedia of Evidence, 139.)

For Respondent there was a brief by *Mr. Albert J. Galen,* Attorney General, and *Mr. W. L. Murphy,* Assistant Attorney General, and oral argument by *Mr. Murphy.*

Mr. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendants were convicted of the crime of grand larceny, alleged to have been committed by them in Dawson county, by

feloniously stealing, taking, leading, and driving away three heifers, of the value of $40, the property of Charles F. Bean. The animals are described as branded "7L" on the left ribs and having a "swallow fork" in both ears. These appeals are from the judgment and an order denying their motion for a new trial.

1. It is contended that the evidence is insufficient to justify the verdict, in that there is no proof of the *corpus delicti*,—in other words, it is not shown that the heifers were the property of Charles F. Bean and that the defendants stole them while alive; and, second, that the larceny, if committed, was committed in Dawson county.

The evidence introduced by the state shows the following: Charles F. Bean resides in Dawson county, on East Redwater creek, about sixty miles north of Glendive, and is the owner of cattle which roam on the neighboring range. On October 1, 1908, one Ernest Bottins was out upon the range in that vicinity, hunting cattle. He was accompanied by Sylvanus Bean, a son of Charles F. Bean. After riding for some time Bean left Bottins, intending to return home for a fresh horse. Soon after they parted, Bottins discovered some fresh dressed beef concealed in the brush in a coulee. There were three whole carcasses, with the hides and heads. The carcasses had each been cut across into two pieces, so as to leave the fore and hind quarters together. They were lying upon the hides, which had also been cut across from side to side. Judging by the absence of offal and the appearance of the surroundings, the animals had been killed and dressed at some other place, and the beef afterward concealed in the coulee. As shown by the udders left on the hides, they were all heifers. Upon noticing the earmarks, Bottins went in search of Bean. Having found and informed him of what he had discovered, Bottins went to bring a stock inspector and deputy sheriff named Bartley, who resided near by. Bean went home, got his rifle, rode to where the beef was lying, and, after examining the brand and earmarks and finding them to be those used by his father, concealed himself in the brush and watched to ascertain who, if anyone, came to take the beef

away. While he was there, three hunters, all of whom he knew, passed up the coulee, but apparently did not see the beef or know anything about it until, upon their presently returning, he called their attention to it. They then passed on, leaving him on watch. About an hour and a half later the two defendants drove up along the coulee in a lumber wagon. Upon arriving at a point opposite where the beef was concealed, they stopped, and, after some conversation as to whether it was fly-blown or not, began to load it into the wagon. Thereupon Bean came out of his place of concealment and arrested them. The part of his testimony detailing what was said by defendants after the arrest is the following: ''Q. After the time the team was unhitched, or during this time that the team was being unhitched, did Keeland make any statement to you? A. Mr. Keeland made a statement to me relative to the killing of this beef at the time the two defendants were there. Q. You may give that conversation now. A. He said he would not have done it if I had not knocked him down here in town. Q. What further statements, if any, did he make along this same line? A. He offered me $100 to let him go. * * * He offered me $100 to try and hush it up and let him go. Q. Now, Mr. Bean, state as near as you can, if you remember Mr. Keeland's exact words. A. He says: 'I will give you $100 if you will drop this or let him (Keeland) out of it.' I don't just remember his exact words; but it was to that effect as near as I can remember. Q. Did he make you any other proposition at that time? A. Yes, sir. Q. State as near as you can in his words. A. He said he would let me have his place for $200, which was less than it was worth, and he would quit the country here and would not bother me any more; that he would leave the country if I would let him go. Q. Did he make any statement to you relative to the killing of other cattle of your father's? A. Yes, sir. He said that that was the first of ours that he had killed. * * * Q. Now, tell the jury, as near as you can, Mr. Randerhoff's words. A. Mr. Randerhoff made a statement to me. * * * Q. Now, will you state as near as you can his words?

A. Mr. Keeland was asking me to settle it, and Mr. Randerhoff said: 'You had better settle it with him.' He says: 'Think of his family. If you push this, it would leave them in bad shape,' something to that effect. He said to let Keeland go and take him on. He did not make any statement to me that he was to blame.'' The witness subsequently stated that he and Keeland had had a difficulty in Glendive a few days before, and that he had knocked Keeland down.

The ranch house of the Beans is about four miles from the point where the beef was concealed; that of Keeland, where Randerhoff was staying and at work for Keeland, is about one mile in the opposite direction, near the coulee below. A public road crosses the coulee about fifty yards above, and another further down near the Keeland house. At the time of the arrest a single wagon track was observed by both Bottins and Sylvanus Bean. From the tracks of the horses attached to it, it appeared to have been made by some one driving out from the upper road and following the coulee down by the place where the beef was found, in the direction of the Keeland house. It was not followed by either witness for more than one hundred yards below. Bean took the defendants from the place of the arrest to a ranch house near by, owned by one Day, leaving their team behind. Having obtained saddle horses, the three returned, accompanied by Leo Brown, whom they found at the Day house. They loaded the beef, the hides, and the heads into the wagon, and then went to the Bean house. They all remained there that night. On the next morning the defendants were taken to Glendive by Bartley, the deputy sheriff, who had come for that purpose at the request of Bottins, and were held for trial. The portion of the hides showing the brand, together with the earmarks, were preserved by the sheriff, and were introduced at the trial. The beef was also taken to Glendive and exhibited to the sheriff and Sylvanus Bean, who was at Glendive at the time of the arrest. On the way from the Day house to the place of arrest Brown and Keeland rode together some distance behind Bean and Randerhoff. Being questioned as to a state-

ment then made by Keeland, Brown testified: "Mr. Keeland said he was in a little jackpot, and would like to have me talk to Mr. Bean and get him to settle it. That is all he said." This was in reply to an inquiry of him by the witness as to what the trouble was. At another place in his testimony he stated: "When we got down to the Bean ranch, Keeland, Randerhoff and I waited outside a few minutes, and Mr. Bean went down to the house. Keeland called me off to one side. I don't think Randerhoff was close enough to hear. * * * The earmarks are on the heads and the brands are on the hides, and he said he would give me fifty plunks if I would let him cut the brands and the earmarks off of the heads and hides. By fifty plunks I understood him to mean $50. I told him I would not do it; that it would be showing neither of them a fair deal." Bartley testified to a statement made to him by Keeland while they were on the way to Glendive, as follows: "We had dinner at Clemon's place, and Keeland and I had some conversation there. I think Randerhoff heard our conversation. The remark he made to me was that he and Doc had been good friends, and he did not see why Doc did not give him the tip 'before he went after me,' and I said I didn't know why he did not give him the tip. He said he and Doc had always been good friends. Palmer lives close to him. I left the impression on his mind that Palmer came after me. At the same time he said something to me about his bond. * * * He says: 'When I get to town, I will give bond there, and, if I do, they will have to catch me again.' " From the testimony of Charles F. Bean and other witnesses it appeared that the "7L" brand was Bean's recorded brand; that he used the "swallow fork" mark besides; that Bean had cattle running on the East Redwater range in Dawson county, near his ranch; and that they were accustomed to range there. This witness and Larson, the sheriff, who examined the beef after it was brought to Glendive, both stated that they had been in the stock business for many years, and had frequently observed the flesh of animals that had been killed and bled, and also that of animals that had not

been bled. They then stated that the animals from which the beef in question had been obtained had been killed and properly bled. No witness was able, from any mark or indication on any part of the animals, to express an opinion as to how they had been killed. Neither did Charles F. Bean or any other witness state that Bean had recently lost any heifers or that the general appearance of the heads or hides showed similarity to the cattle owned by Bean. The arrest was made in Dawson county.

The testimony of the two defendants was to the effect that they knew nothing of the concealment of the beef in the coulee until they were arrested; that at that time they were on their way up the coulee to get a load of wood, and did not know that the beef was there until they were stopped by Sylvanus Bean, and their attention was called to it by him. They also introduced the testimony of several witnesses which tended to show that they had for several days prior to the time of their arrest been busily engaged at work on the ranch, and had had no opportunity to get out upon the range. They both denied making any statement whatever to Bean, Brown, or Bartley.

The statute (sec. 8645, Rev. Codes) declaring the stealing of any of the animals named therein, including heifers, to be grand larceny, refers to live animals of whatever value. Under the charge in the information, therefore, the defendants could not be convicted of a larceny of the beef, no matter what its value may have been. The jury were therefore properly instructed that they should return a verdict of acquittal, unless the evidence satisfied them beyond a reasonable doubt that the defendants killed, or took part in killing, the heifers in question, or one or more of them, with the intent to deprive the true owner of his property. They were also properly instructed that it must appear beyond a reasonable doubt that the heifers were the property of Charles F. Bean, and were killed in Dawson county.

Counsel for defendants made the contention that, as the evidence is entirely circumstantial, it furnishes no legal support

for the finding of the jury, because the *corpus delicti,*—that is, the larceny of animals belonging to Charles F. Bean—may not be allowed to rest upon this character of evidence alone; in other words, that this element of the case must have been proved in part at least by direct evidence. It is true that the evidence is entirely circumstantial; yet this furnishes no reason why the conviction should not be sustained. While the defendant is not required in any case to answer the charge against him in the absence of evidence upon the part of the prosecution sufficient to establish the *corpus delicti,* yet it is not essential in all cases that it must be established in whole or in part by direct evidence. This statement of the rule applicable is substantially that of Mr. Justice Hawley in *State* v. *Cardelli,* 19 Nev. 319, 10 Pac. 433, in which the facts bear striking similarity to the facts in this case. In *State* v. *Keeler,* 28 Iowa, 551, it is said: "The rule should be adhered to with the utmost and strictest tenacity that the facts forming the basis of the offense, or *corpus delicti,* must be proved, either by direct testimony or by presumptive evidence of the most cogent or irresistible kind. In one of these methods the essential fact or facts must be established beyond a reasonable doubt. But if thus established, or if the jury can be and are satisfied of such facts beyond this reasonable doubt, it matters not whether they are conducted to this result by direct or presumptive evidence. In other words, while the proof should be clear and distinct, it is not necessary that it should be direct and positive; for, while that which is direct might be more satisfactory—less liable to deceive and mislead—this goes to its weight or effect, and by no means establishes that in no other way can the essential facts be shown with the requisite distinctness and clearness."

In section 1057 of volume 1 of his New Criminal Procedure, Mr. Bishop states the rule thus: "Circumstantial evidence is admissible to the *corpus delicti* the same as to the other parts of the case; and the jury may find a verdict of guilty solely upon it, equally in murder and in all other crimes." So the

rule is stated by Mr. Greenleaf and Mr. Wigmore (3 Greenleaf on Evidence, 16th ed., sec. 30; 3 Wigmore on Evidence, sec. 2081.) Under the statute in this state, however, in cases of unlawful homicide the proof of the *corpus delicti,* so far as it concerns the death of the person alleged to have been killed, must be made by direct evidence. With this single exception as to its application, the rule as stated by these authorities is the correct one, we believe, and applies to all crimes alike. Of course, the crime and the connection of the defendant with it must always be established as independent facts, but, with the exception referred to, both may rest entirely upon circumstantial evidence.

The evidence stated in substance above shows that the animals in question bore the brand and earmarks used by Bean to identify his cattle; that the carcasses were those of animals recently killed and dressed for beef; that the beef had been concealed in the coulee, to be taken away later; that its whereabouts was known to the defendants, as indicated by their attempt to take it away; that one of them, while in the presence of the other, who did not deny it, admitted having killed the animals and that they belonged to Bean; and that this one of the defendants then and subsequently made different efforts, some in the presence of his codefendant and others apparently without his knowledge, to adjust the matter and avoid a charge of larceny, by offering corrupt inducements to those who had made the arrest and had him in charge. These circumstances, while not pointing with absolute certainty to the conclusion that the defendants were guilty of the larceny of the animals, nevertheless furnish a sufficient foundation for an inference of their guilt, which it was the province of the jury to draw.

2. So much, however, cannot be said of the evidence tending to show that the crime was committed in Dawson county. The beef was found in Dawson county; the defendants were arrested there with it in their possession; but the surrounding circumstances about which there is no dispute tend strongly to show that it had been brought from elsewhere to the place of conceal-

ment. This is all of the evidence tending to show the *locus* of the crime. It is a matter of common knowledge that cattle range widely, paying no attention to county or state lines. While the cattle of Mr. Bean may customarily have ranged near his ranch house, along East Redwater creek, this does not tend to show that they did not often stray away to great distances and cross the county lines of adjacent counties or the state line into Dakota on the east. The venue must be proved beyond a reasonable doubt, just as any other fact. In our opinion the proof is not sufficient in this regard to support a conviction. For this reason the defendants are entitled to a new trial.

3. When Sylvanus Bean was questioned as to the statements made to him by the defendants at the time of the arrest, objection was interposed that no proper foundation had been laid for their introduction. A like objection was also made to the admission of the statements of Keeland to Brown and Bartley. The objections were overruled. Counsel now contend that the rulings were erroneous, in that the statements were in the nature of confessions, and that it should first have been made to appear that they were not induced by fear, or threats, or the hope of leniency. The two statements made by Keeland touching the killing of the animals necessarily implied guilt. At the time he made them he was, possibly, wholly unconscious of their import. They were not in response to any question put to him by Bean, but were impelled by the embarrassment produced by his discovery in the act of making final disposition of the property obtained by the larceny. Such statements are mere admissions forming a part of the conduct of the accused and do not partake of the nature of confessions—that is, direct assertions of guilt, the sense in which this term is technically used—and hence do not fall within the rule applicable to confessions. (2 Wigmore on Evidence, sec. 821.) It was not necessary, therefore, that any preliminary foundation should have been laid for their admission. The other statements to this witness and to Brown show that Keeland was seeking by corrupt means a way of escaping from conviction by compounding the felony, after

it became evident that Bean intended to push the prosecution. Such statements have none of the attributes of a confession, and their admissibility is not subject to the same limitation. The statement made by Randerhoff, though it did not amount to a corrupt solicitation to Bean, was otherwise of the same import as those made by Keeland. The same may be said of the statements made to Bartley. The one was a complaint that Palmer had not given Keeland an opportunity to escape, and the other was a threat to escape in case he found that he was able to secure a bail bond. The rulings were proper.

Contention is made that the court erred in permitting Charles F. Bean and Larson to express their opinions as to whether the beef was that of animals killed and properly bled. The ground of the objection was that the subject was not one calling for expert testimony. The ability of a witness to answer the inquiry in question is not within the range of common observation, but can be acquired only by special observation and experience in the cattle business. It was therefore competent to admit the evidence, the witnesses having shown by their preliminary examination that they were qualified. (Rev. Codes, sec. 7887.)

Complaint is made that the court erred in refusing to submit several instructions requested by the defendants. It is not necessary to give special notice to any of them. Upon examination of the charge we find that it covers all the several requests so made. There was no error in refusing them.

The judgment and order are reversed, with directions to the district court to grant defendants a new trial.

*Reversed and remanded.*

MR. JUSTICE HOLLOWAY concurs.

MR. JUSTICE SMITH: I dissent from that portion of the foregoing opinion relating to proof of venue, for the reason that in my judgment the venue was sufficiently established by circumstantial evidence.