STATE, RESPONDENT, *v.* FOLEY, APPELLANT.

(No. 3,033.)

(Submitted November 25, 1911.  Decided December 12, 1911.)

[120 Pac. 225.]

*Criminal Law — Grand Larceny — Livestock — Information — Clerical Error—Amendment—Expert Testimony—Admissibility—Instructions.*

Criminal Law—Information—Clerical Error—Immateriality—Amendment—Effect.
   1.   The mere misspelling of the word "feloniously," so that it read "felobiously," did not render an information charging defendant with the larceny of certain cattle fatally defective; nor was it necessary to rearraign defendant after amendment by the insertion of the letter "n" in place of the letter "b," permitted to be made subsequent to the swearing of the jury.

Same—Habits of Livestock—Expert Testimony—Admissibility.
   2.   Under section 7887, Revised Codes, persons familiar with cattle and their habits were properly permitted to testify as to the improbability of the animals, alleged to have been stolen, straying a certain distance from the place where they were seen a few days prior thereto.

Same—Evidence—Admissibility.
   3.   Testimony elicited by a question whether the witness had seen any cattle of the brand borne by the animals charged to have been stolen, running in the vicinity where he and defendant lived, was competent and material.

Same—Expert Testimony—Admissibility.
   4.   The admission of testimony that when sucking calves are taken from their mothers and confined in a corral, the cows will stay in the vicinity of the corral, and that if cows with calves are located near water, they will generally stay in the vicinity unless moved by somebody, was proper.

Same—Instructions—Request—Refusal, When Proper.
   5.   Where the substance of requested instructions on the burden of proof, and the question of intent in a cause involving the larceny of

cattle was covered by the charge given, refusal to instruct as requested is not error.

*Appeal from District Court, Custer County; Sydney Sanner, Judge.*

R. H. FOLEY was convicted of the crime of grand larceny, and appeals from the judgment and an order denying him a new trial. Affirmed.

Cause submitted on briefs of counsel.

*Mr. George W. Farr,* for Appellant.

*Mr. Albert J. Galen,* Attorney General, and *Mr. W. S. Towner,* Assistant Attorney General, for Respondent.

MR. JUSTICE SMITH delivered the opinion of the court.

Defendant was convicted of the crime of grand larceny, in the district court of Custer county. He appeals from the judgment and also from an order denying his motion for a new trial.

The following is a summary of the testimony: Frank Van testified for the state: ''Defendant was at my place on the 8th day of November, 1909; he asked me if I knew some of his cattle and I told him I knew of one steer about the mouth of Little Whitney creek where it runs into the main Whitney creek; he started in that direction; at the time I saw his steer on Whitney creek, there were twenty or thirty of Kempton's cattle in the bunch; I noticed four cows with unbranded calves, three of the calves were red and one was black; the black calf was following a black cow; they go about five or six miles around there where they used to run on Whitney creek; I had seen them three times before that on Whitney creek about a week before Foley went up there; I have paid some attention to the habits of cattle; I have been raising them for ten years; a young steer will stray over more territory mostly than a cow with a calf; cows with calves ranging on water will run over a small territory; I saw these four cows running on Whitney creek the day before defendant was at my place; I saw them again on

the 11th down around Foley's ranch and the fence; they were the same bunch I saw on Whitney creek; they had no calves with them when I saw them at Foley's fence; I went back with Harrison and Rhode the next morning and we found these four cows at the same place; we took them to Foley's house and turned the calves out to the cows and I saw them suck; they were the same cows and calves that I saw on Whitney creek; those cows and calves would have to cross the Milwaukee railroad to get to Foley's ranch; they would have to go about two miles around to cross; they couldn't go straight; the Cabin creek brakes are about four miles from Foley's place; I never saw these four cows up in that country; never saw any of the Kempton cattle up in that country; Foley's is about twelve miles from Whitney creek; the cattle looked gaunted up."

Harrison testified: "Rhode and Van went with me to the defendant's ranch on November 13; we found four of Kempton's cows three or four hundred yards below Foley's pasture; took them up to the house and turned them into a corral with nine calves; four of the calves went to the cows and sucked them; the calves were not branded; there was one black calf went to the black cow and two freckled-faced calves and one deep red; the cows were outside of the fence when we saw them; I saw the defendant and he said he had authority to gather these cows and calves and that he got them on the head of Cabin creek brakes; he said the Kemptons had given him authority; the Cabin creek brakes are five to eight miles east of Foley's; the junction of Whitney and Little Whitney creeks is between twelve and fifteen miles from defendant's ranch; I would judge it to be between twenty-two and twenty-five miles from Cabin creek to where Little Whitney flows into Whitney creek."

Fisher testified: "Defendant lives about two and a half miles from me; I have never seen any of the node brand of Kempton's cattle in the vicinity where I and defendant live for the last year or two."

Rhode testified: "On November 12 or 13, Harrison, Van and I went to defendant's ranch; we found some calves in a corral and saw some cows in the pasture and some that were out,

four head outside belong to Kempton; they did not have any calves with them; we drove them down to the corral and four out of nine calves went to sucking the cows; we found these four cows about a mile from the house; there were forty or fifty head of cows in the pasture; Harrison told defendant that he had some calves in the corral that didn't belong to him, and he said he knew he had; he said he had some of Kempton's cattle in there, and that he figured on notifying Kempton; he said he put them in there to keep the cows from drifting until he could notify Kempton; he told us he got them on the cedar brakes on Cabin creek.''

Johnson testified that in November or along the latter part of October he saw three unbranded calves of Kempton's at the forks of Big Whitney creek and Little Whitney creek; one of the mothers was a black muley cow. Aronson gave similar testimony.

The defendant Foley testified that in September, 1909, he met Asa Kempton when the Kempton outfit was shipping cattle and told him ''if he saw any of my cattle down there, to hold them for me and I would hold his if I found them on my range, and he said all right. I was to hold his cattle on Pine creek and he mine on Whitney and Fallon creeks''; after this conversation with Van he went to Whitney creek and brought one steer home; the next day he rode to the Cabin creek brakes and found four of Kempton's cattle with unbranded calves and took them home with him to hold them for Kempton, believing that he had authority from Asa Kempton; he took them to his ranch and put them in the pasture but they got out twice, so he put the calves in the corral; the next morning he ''wrote Kempton a letter notifying him that I had some of his cattle but never had time to mail it, it stormed that day and I didn't go to town, and I thought I would wait until the next day, but about 6 or 7 o'clock in the morning Harrison came''; he told Harrison that the cattle belonged to Kempton and that he attempted to notify Kempton; Deckert, his brother in law, Pat Foley, his brother, and Pat's wife and Mr. Folk were present when the letter was written. A letter was introduced in evidence.

Folk testified that when defendant brought the cows and calves home he said they belonged to Kempton, and that he was going to put them in the corral and keep them for him; he saw the cattle a number of times during the 12th, but did not know that they got out of the pasture, if they did get out; he saw Foley write a letter on the 12th; Foley intended to mail the letter that day, but it was storming and he did not go to town.

Pat Foley testified that defendant said the cows and calves belonged to Kempton; he saw the cows in the pasture "only the day he put them back in again"; witness saw the letter to Kempton. Mrs. Pat Foley's testimony was in substance the same as that of her husband.

Bruhns testified that he heard the conversation between defendant and Asa Kempton substantially as narrated by the defendant.

Deckert testified that defendant said the calves in the corral belonged to Kempton; he also testified to seeing defendant write the letter; witness read the letter.

. Asa Kempton denied that he ever had any such conversation or agreement with defendant as that testified to by him and Bruhns; he said he was not acquainted with defendant and did not know his cattle brand; neither did he know where his cattle ranged.

1. The information upon which the defendant was arraigned charged that he did "felobiously steal," etc. At the beginning of the trial, after the jury had been sworn, the state asked leave to amend by inserting the letter "n" in place of the letter "b." [1] Over defendant's objection the amendment was allowed. There was no error in this ruling. "Felobiously" as written was evidently a clerical or typist's error. The letter "b" was inadvertently written in place of the letter "n." It was a mere error in spelling. No one could have been misled thereby. It was not necessary to rearraign the defendant after the amendment was made. (*State* v. *Lu Sing,* 34 Mont. 31, 85 Pac. 521.)

2. Complaint is made that the state was permitted, over objection, to inquire of witnesses as to the habits, conduct and actions of cattle under certain conditions. We find no error in

the rulings. The witnesses had qualified as men having knowledge of cattle and their habits. Defendant had said and afterward testified that he got the cattle between the Cabin creek brakes and Riley's spring, while the theory of the state was that they were the same cattle that three witnesses had seen on Whitney creek, several miles distant. It was proper for the state [2] to prove, if it could, the improbability of cattle straying to that distance from the place where they were seen but a few days prior thereto. A man unfamiliar with the habits of cattle might not be able to determine how far they will wander. Therefore it was entirely proper to elicit the information from those who understood their habits in that regard. The opinion of a witness respecting a question of science, art or trade, when he is skilled therein, is competent evidence. (Rev. Codes, sec. 7887.) The point raised was, in effect, decided adversely to the defendant's contention, in the case of *State* v. *Keeland,* 39 Mont. 506, 104 Pac. 513.

3. It is contended that the court erred in permitting the witness Fisher to answer whether he had seen any cattle of the. [3] node brand running in the vicinity where he and the defendant lived, for the reason that the matter was immaterial. The reception of immaterial testimony is not ordinarily ground for reversal of a cause. But we think this testimony, while negative in character was competent and material.

4. The witness J. B. Kempton was allowed to testify, over objection, that when sucking calves are taken from their mothers and confined in a corral, the mothers will stay in the vicinity [4] of the corral. We find no error in the action of the court in admitting this testimony. The witness was also allowed to testify, and properly we think, that if cows with calves are located on water, they generally stay "in a smaller scope of territory, unless they are moved by somebody."

5. Error is assigned upon the refusal of the court to give three certain instructions, to the effect (1) that it devolved upon the state to prove beyond a reasonable doubt that defendant took, stole and carried away the calves described in the information, with intent to convert them permanently to his own use, and (2)

if the jury found that when he first took the calves into his possession he did not intend to steal them, he would not be guilty of larceny.  The court refused to give the instructions for the reason that the substance thereof had been covered by other instructions.  We think the court was correct.  The jurors were charged that before a conviction could be had, they must find beyond a reasonable doubt (a) that there was in fact a larceny committed; (b) that the property taken was the precise property described in the information; (c) that such taking was felonious, that is, with intent to steal; (d) that the defendant willfully accomplished such taking; (e) that the property taken belonged to the Kempton Land & Live Stock Company, as charged; and (f) that the defendant was presumed to be innocent until proven guilty beyond a reasonable doubt.  The court also charged the jury that, unless the defendant at the time he took the animals did in fact then intend to steal the same, he could not be convicted even though he may thereafter have formed an intent to steal or appropriate the same to his own use.  We think these instructions fully covered the matter.

6. After reading the evidence, we have no doubt of its sufficiency to justify the verdict.

The judgment and order are affirmed.

*Affirmed.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.