## STATE, Respondent, *v.* KUUM, Appellant.

(No. 4,264.)

(Submitted January 8, 1919. Decided January 31, 1919.)

[178 Pac. 288.]

*Criminal Law—Homicide—When Excusable—Accident—Pointing Firearm—Assault—Manslaughter—Malice—Presumptions—Insanity—Instructions.*

Homicide—When Excusable—Evidence.
    1. To justify a finding that a homicide by shooting was excusable, under section 8299, Revised Codes, where defendant and deceased were strangers, the evidence must show that when the shot was fired, defendant was doing a lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent.

Same—When Unintentional—Evidence.
    2. Where, in a prosecution for homicide, the evidence showed that defendant and deceased were strangers and apparently friendly; that there was no swearing or threatening language used by either; that defendant was much intoxicated at the time; that deceased himself stated that the shot was an accident, and that there was no motive for the shooting, the conclusion follows that the killing was unintentional.

Pointing Loaded Firearm—Assault.
    3. One who points a loaded firearm at another with the purpose of doing the latter an injury or putting him in fear, is guilty of

assault; if the pointing of the weapon is accidental and unaccompanied by any unlawful purpose or intent, the act is not a crime.

Homicide—When Excusable—Jury Question.

4. The question whether defendant while intoxicated and in the act of exhibiting his revolver to the deceased, also under the influence of liquor, exercised that usual and ordinary caution in handling the weapon made necessary by section 8299, Revised Codes, to render the killing excusable, was a question for the jury.

Homicide—Negligent Handling of Firearm—Manslaughter.

5. The negligent handling of a loaded firearm (or other dangerous agency) causing or contributing to the death of another person is involuntary manslaughter within the meaning of subdivision 2 of section 8295, Revised Codes.

[As to condition of mind of slayer which reduces murder to manslaughter, see note in 134 Am. St. Rep. 726.]

Same—Evidence—Murder in Second Degree—Presumptions.

6. Where the state establishes the killing of deceased by defendant, and there is no evidence tending to show circumstances of mitigation or to justify or excuse it, the presumption arises that the killing was prompted by malice and was murder in the second degree; and the burden thereupon is upon defendant to produce evidence sufficient to create a reasonable doubt of the existence of malice, if he would reduce the degree of homicide to manslaughter.

Same—Manslaughter—Presumptions—Malice.

7. Where the state's evidence tends to show that the homicide committed only amounts to manslaughter, the presumption of malice does not obtain, and the defendant may take advantage of the case as made by the state to reduce the homicide to manslaughter, and refrain from introducing any evidence.

Same — Manslaughter—Defendant's Guilt—Withdrawing Question from Jury.

8. Where the state's evidence made out only a case of manslaughter it was error to refuse defendant's request to withdraw from jury the question whether the evidence made out a case of murder.

Same—Insanity—Proper Refusal of Instruction:

9. Evidence that defendant's reason had been clouded by intoxication during the earlier hours of the homicide, and that he suffered periodical attacks due to a diseased condition of the heart, did not warrant an instruction upon the question of his insanity.

*Appeal from District Court, Mineral County; Theo. Lentz, Judge.*

ALEX KUUM was convicted of murder in the second degree, and from the judgment and an order denying a new trial he appeals. Judgment and order reversed and cause remanded.

*Messrs. Murphy & Whitlock,* for Appellant, submitted a brief; *Mr. A. N. Whitlock* argued the cause orally.

In the absence of any evidence aside from the shooting, assuming defendant fired the shot, there are only three possible

conclusions,—intentional killing, negligent killing, accidental
or unintentional killing. The first, we submit, is fully rebutted
by the facts; negligence will not be presumed, and if it should
be, then the crime resulting from the negligent use of a gun
would be manslaughter and not murder, and the court in that
event should have sustained defendant's motion to withdraw the
question of murder from the consideration of the jury. (Whar-
ton's Criminal Law, p. 618; *State* v. *Stitt,* 146 N. C. 643, 17
L. R. A. (n. s.) 308, 61 S. E. 566.)

Under the evidence the defendant was entitled to have the
issue of excusable homicide submitted to the jury. The follow-
ing recent cases somewhat similar in character so hold: *McPeak*
v. *State,* 80 Tex. Cr. 50, 187 S. W. 754; *Maldonado* v. *State,*
70 Tex. Cr. 205, 156 S. W. 647; *Fitzgerald* v. *State,* 112 Ala. 34,
20 South. 966; *Brock* v. *Commonwealth,* 33 Ky. Law Rep. 630,
110 S. W. 878.

The issue of insanity should be presented by instructions if
there is any evidence on the point. (*Alberty* v. *State,* 10 Okl.
Cr. 616, 52 L. R. A. (n. s.) 248, 140 Pac. 1025; *Litchfield* v.
*State,* 8 Okl. Cr. 164, 45 L. R. A. (n. s.) 153, 126 Pac. 707;
*Smith* v. *State,* 12 Okl. Cr. 307, 155 Pac. 699; *Duke* v. *State,*
61 Tex. Cr. 441, 134 S. W. 705.)

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,*
Assistant Attorney General, for the State, submitted a brief;
*Mr. Woody* argued the cause orally.

While the evidence, taken as a whole, may possibly fail to
show that degree of premeditation and deliberation necessary to
constitute murder in the first degree, yet unquestionably it does
tend to show the existence of all of the essential elements neces-
sary to constitute murder in the second degree, and this being
so, while possibly the court should have withdrawn from the
jury all consideration of the question of guilty or innocence of
murder in the first degree, yet, the jury by its verdict having
acquitted the defendant of murder in the first degree, failure to
do so did not constitute reversible error. (*Morgan* v. *Territory,*

16 Okl. 530, 85 Pac. 718; *Ross* v. *State,* 8 Wyo. 351, 57 Pac. 924; *People* v. *Taylor,* 36 Cal. 255; *State* v. *Felker,* 27 Mont. 451, 71 Pac. 668, 671; *Shields* v. *State,* 149 Ind. 395, 49 N. E. 351.)

If the defendant in drawing and pointing the revolver at the deceased was committing an unlawful act, then the killing of the deceased was not homicide by misadventure, but was involuntary manslaughter. (*Ford* v. *State,* 71 Neb. 246, 115 Am. St. Rep. 591, 98 N. W. 807; *Williamson* v. *State,* 2 Ohio C. C. 292; *Williams* v. *State,* 83 Ala. 16, 3 South. 616; *State* v. *Emery,* 78 Mo. 77, 47 Am. Rep. 92.)

When a firearm is pointed or aimed by one person at another, or in the direction of another, and is discharged, killing the person at whom it is pointed or aimed, and there is no malice or intention on the part of the slayer to kill or injure, but there is carelessness and negligence on the part of the slayer, the homicide is not by misadventure, but is manslaughter. (*Murphy* v. *Commonwealth,* 15 Ky. Law Rep. 215, 22 S. W. 649; *Burton* v. *State,* 92 Ga. 449, 17 S. E. 99; *Cook* v. *State,* 93 Ga. 200, 18 S. E. 823; *Tharp* v. *State,* 99 Ark. 188, 137 S. W. 1097; *State* v. *Morahan,* 7 Penne. (Del.) 494, 77 Atl. 488; *Tyner* v. *United States,* 2 Okl. Cr. 689, 103 Pac. 1057; *State* v. *Vance,* 17 Iowa, 138, 139; *Minton* v. *Commonwealth,* 79 Ky. 461, 463; *State* v. *Morrison,* 104 Mo. 638, 16 S. W. 492; *State* v. *Grote,* 109 Mo. 345, 19 S. W. 93; *Meyers* v. *State* (Miss.), 23 South. 428; *Austin* v. *State,* 145 Ala. 37, 40 South. 989; *State* v. *Dugan,* 1 Houst. C. C. 563; *Woods* v. *State,* 137 Ga. 85, 72 S. E. 908; 1 Wharton's Criminal Law, 618; 13 R. C. L. 860.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendant, Alex Kuum, was convicted of the crime of murder in the second degree and sentenced to a term of imprisonment in the state prison. He appeals from the judgment and an order denying him a new trial.

The first contention made in his behalf is that the evidence was insufficient to justify the verdict (1) in that, though that

introduced by the state showed that the defendant shot and killed the deceased, it also showed that the killing was accidental and therefore excusable; and (2) that, though it be conceded that the killing was not excusable, the evidence from any point of view did not justify a finding of any higher grade of homicide than involuntary manslaughter.

The killing occurred on October 1, 1917, at Sildix, a flag station on the Northern Pacific Railway in Mineral county, two or three miles from the Idaho state line. The defendant resided at Mullan, Idaho. He is a Russian from Esthonia, ignorant, of a low order of intelligence, and unable to speak the English language beyond a few words. On the morning in question he came by train to Sildix, arriving at about 11 o'clock. Several others arrived at the same time, all of whom were strangers to him. These were Finlanders, as were also all the others who were about the place during the day, including Godfried Peterson, the deceased. None of them spoke English well; nor did the defendant understand or speak the Finnish language. The defendant as well as the other witnesses gave their testimony through an interpreter. For this reason, and because of the fact that at the time of the shooting all of them were more or less under the influence of liquor and consequently that their recollection of what occurred was imperfect, it is difficult to gather a clear account of the incidents preceding and leading up to the killing. A cabin near the station owned by one Everett was occupied and used at the time by the witnesses Norman and Lebstadt as a boarding-house to accommodate those who worked in mining prospects in the mountains near by. Apparently it was used also as the headquarters for the conduct of an illicit trade in alcoholic liquors to be conveyed across the line into Idaho, as well as to furnish them by the drink to any one who cared to go there. The cabin consisted of two rooms besides a woodshed in the rear. The rooms were connected by a door. One of them was called a sitting-room. In it were two beds, one large and the other a small one, the former situated near the door leading out to the front. The other room

was used as a kitchen and eating-room. A door opened from the sitting-room into the woodshed. The small bed was near the door. As soon as the defendant reached the place he began to drink, and, in company with others, including the deceased, continued to do so until 4 or 4:30 o'clock in the afternoon. The deceased made his home at Sildix.

There is no evidence disclosing how he and the defendant became acquainted with each other, nor how they happened to be together at the time of the shooting. It does not appear that they had met before that day. A few minutes before the shooting they came into the sitting-room together. Both of them had been drinking, but were apparently friendly. Gus Sundberg, the only eye-witness of the shooting, was lying on the large bed. Ernest Carlson was sitting by him on the bed talking to him. The defendant and deceased were standing together talking, apparently discussing the quality of a revolver which the defendant had taken from his pocket. The few words overheard by Sundberg and Carlson were spoken in English. The only words Carlson heard were: "Liberty! We have no liberty." These were spoken by the defendant. The following excerpts from the testimony of Sundberg furnish the only explanation as to how the shooting occurred: "I seen him [Kuum] have a gun in his hand; he took it out of his pocket or had it in his hand. I don't know. He was holding it this way. As to how he was holding it, * * * I will ask you to show me the gun. As far as I remember, I noticed the flash—he held it in this manner [indicating]. I didn't notice much. He was talking and doing some motion. I didn't pay attention, but I remember Godfried [the deceased] got hold of the business end and says, 'That gun ain't no good,' and I thought it was all over. And at that time I was talking too. I took my eye off, and I was talking to Carlson about leaving the place, and all at once I noticed this here motion, and all at once it went off. Q. Now I want to ask you just one other thing as to that, and we have to ask all of these things. After Alex had the gun up this way [illustrating] and Peterson had his hand over there and Peter-

son said, 'That gun wouldn't hurt anybody,' or 'shoot anybody,' or whatever it was, did Alex hold it down this way and then up this way [illustrating]? A. I noticed the motion distinctly. I took my eye off, and just as I looked back I noticed the motion. It was just a short-arm movement. I don't think it came from the pocket. I don't believe it ever went to the pocket. * * * Yes, he [deceased] was backing away from him at the time he had hold of the gun, and Kuum was following him up, apparently. As to whether Peterson was pulling the gun or Kuum was pushing him, I didn't pay much attention. When I saw the gun they were perfectly still—they were perfectly still. I didn't hear any loud or violent talk between them. There was no loud talk. Q. Then, the last you saw before the fatal shot was fired, Peterson had hold of the gun barrel A. Previous to that. The next thing I saw, Kuum drawing the gun down on Peterson. I saw the actual explosion. I don't know where Kuum brought his hand from when the shot was fired; all I noticed was that short-arm movement. It is my impression that the shot, the explosion, seemed to be an answer to the challenge that the gun was no good; it followed the remark so fast—it came just after that remark. * * * As to whether Peterson actually had hold of the end of this gun, or how, and being asked to illustrate, I will say that he was slipping around with his fingers like this [illustrating] and says, 'This is no good.' So that he didn't have hold of it as counsel for the state now has—not tight. * * * As to the short-arm movement which I have illustrated, I couldn't say how Peterson was holding it, whether he had it up that way as you illustrate, or down. I took my eyes away just after that; and the next time I looked I saw Alex pull the gun on him with this short-arm movement that I have indicated. In answer to Mr. Murphy I said the gun went off. As to whether I meant that it went off while Peterson was holding the end like that and it was being held up like that by the other, no; I can't rightly answer that question. I have already illustrated that there was this movement of the arm; that is right. * * * As to

whether they were fighting or quarreling, I thought they were more in a joshing way; I don't recall Kuum saying a word. As to whether there was a quarrel between them, that was all the talk there was. No, indeed, there was no swearing or threatening language. So far as I know, judging from all I saw previous to the shot being fired, they were as friendly as drunken people can be. Yes; that is very friendly. I believe they can be more friendly then than in any other condition.''

The witness Carlson was sitting with his back toward the defendant and the deceased, and aside from the few words he heard defendant speak, his attention was not directed to them until, hearing the shot, he turned and saw the deceased fall, exclaiming ''I am shot.'' He then saw defendant with the revolver in his hand. He had not seen it until that time. This witness had been drinking with the defendant. When the shot was fired he ran from the room. A few minutes later he returned with others, who seized the defendant and held him down for a few minutes on the small bed. We quote the following from his testimony: ''They were not quarreling, and there was no loud talking. No; I did not see a gun in the hands of Kuum at that time. The first that I knew that there was a gun there at all was a shot that I heard fired. * * * They were both pretty drunk. I thought they were good friends. So far as I could judge they were very friendly; that is true. * * * Kuum was excited after the shot—after it was all over. He didn't seem to be excited before or angry. It was all after this occurred.'' The defendant and the deceased were both strangers to this witness.

The witness Charles Lattman passed through the room to the kitchen a few minutes before the shooting. He was sitting at the table eating when it occurred. As he passed through the room he saw the defendant and the deceased standing talking together. He heard the deceased say, ''You shouldn't do that.'' At that time they seemed to be ''good friends.''

Dr. Fulscher, called from Saltese to attend the deceased, reached Sildix about 6:30 o'clock in the evening. He found de-

ceased suffering from a wound in his abdomen. After adminis-
tering restoratives he.questioned him. "I asked him if there
had been a quarrel, and he said, 'No' he had not had any words
at all, and I said, 'Did this man shoot you intentionally?' and
he said, 'I think it was an accident.'" Later he questioned
the deceased further, asking whether the shooting was an acci-
dent or not, The reply made was, "I guess he didn't like me."
During the hour or more he was with him, the deceased did not
"at any time make any expression of hostility toward Kuum at
all. Mr. McKinley and I were questioning him together to
get a statement, and he said, 'It was only an accident.'"

McKinley was a deputy sheriff residing at Wallace, Idaho.
He removed the deceased to Wallace, where he died during the
night. While at Sildix he asked deceased "if there was any
trouble, what the cause of the shooting was," and he said,
"There was no trouble, no quarrel; he just pulled down and
shot me."

This is all the testimony introduced by the state except that
there was evidence tending to show that the defendant after he
was released made some attempt to leave the neighborhood of
Sildix and conceal himself. It was not contradicted in any sub-
stantial particular by the testimony of the defendant or any of
his witnesses, the defendant himself not questioning the account
given by Sundberg, the principal witness for the state. On the
contrary, he stated that after he had taken two cups of whisky
and hot water soon after his arrival at Sildix, he lost his memory
entirely, and did not know what had occurred thereafter until
later in the evening, when he found himself at Mullan, and was
told by a friend there that he had shot a man. There was testi-
mony to the effect that immediately after the shooting both
defendant and deceased stated that it was an accident.

We do not think that the evidence required the conclusion as
a matter of law that the homicide was the result of an accident,
[1] and was therefore excusable within the meaning of section
8299 of the Revised Codes. Subdivision 1 of that section de-
clares a homicide to be excusable "when committed by accident

or misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." The defendant and the deceased were strangers. This being so, the homicide was excusable, if at all, under the last clause of the subdivision quoted. In other words, the evidence must have furnished the basis for the single inference that when the shot was fired defendant was engaged (a) in doing a lawful act; (b) by lawful means; (c) with usual and ordinary caution; and (d) without any unlawful intent. It is said by counsel that it may be as fairly inferred from the evidence that the deceased brought about his own death by taking hold of the revolver and pulling it, and thus causing the shot to be discharged, as that defendant discharged it. Taking into consideration the fact [2] that the defendant and the deceased were strangers; that they were apparently friendly; that there was no swearing or threatening language used by either; that the defendant was very much intoxicated at the time; that deceased himself said that the shot was an accident; and that there was no motive for [3] the shooting—we conclude that it was unintentional. If one person presents a loaded firearm at another, with a purpose to do the other an injury or put him in fear, he is guilty of doing an unlawful act, for it amounts to an assault. (*State* v. *Barry,* 45 Mont. 598, 41 L. R. A. (n. s.) 181, 124 Pac. 775; *State* v. *Papp,* 51 Mont. 405, 153 Pac. 279.) But if the pointing of the weapon is accidental, or if there is no purpose or intention to injure the other by putting him in fear or otherwise, the act is not unlawful, in the sense that it is a crime punishable by law.

This conclusion, however, does not render necessary the additional conclusion that the homicide was excusable. It was [4] still a question to be resolved by the jury whether the defendant was exercising usual and ordinary caution in handling the revolver as he did. It is a possible inference from the witness Sundberg's account of the shooting that after the defendant took the revolver from his pocket he held it so that it was pointing toward the deceased, and that, if by any means it should

be discharged, it would almost surely injure him. The jury could conclude that the defendant was not in the exercise of the measure of caution or careful attention which the circumstances demanded. It is true that it is not clear whether, when the shot was fired, the deceased had hold of the revolver; but, assuming that he did retain hold of it until the shot was discharged, and assuming, further, that he pulled it in an effort to get possession of it or in order to make further examination of it, thus causing the discharge, there was still left room for the inference that the discharge would not have occurred if the defendant had not been careless in attempting to retain possession. However this may have been, it was the province of the jury to determine whether the killing was excusable. If it was **[5]** not excusable, it was involuntary manslaughter within subdivision 2 of section 8295 of the Revised Codes. The negligent handling of a dangerous agency such as a loaded firearm, causing or contributing to the death of another person, is involuntary manslaughter. (1 Wharton's Criminal Law, sec. 305; 1 McClain's Criminal Law, secs. 345, 349.)

The contention, however, that the evidence did not justify the finding of murder in the second degree is well made. Section **[6]** 9282 of the Revised Codes provides: ''Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.'' Under this provision, the state having established the killing by the defendant, in the absence of any evidence tending to show circumstances of mitigation or to justify or excuse it, the presumption arises that the killing was prompted by malice and was murder in the second degree. If the prosecution then seeks to convict the accused of murder in the first degree, the burden is upon it to prove deliberation. So the burden would rest upon the defendant to produce evidence sufficient to create a reasonable doubt of the existence of malice

if he would reduce the grade of homicide to manslaughter. (*State* v. *Fisher,* 23 Mont. 540, 59 Pac. 919.)   The burden cast upon the defendant would not at any stage of the trial be greater than this.   (*State* v. *Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026; *State* v. *Peel,* 23 Mont. 358, 75 Am. St. Rep. 529, 59 Pac. 169; *State* v. *Fisher, supra; State* v. *Leakey,* 44 Mont. 354, 120 Pac. [7]   234.)   When, therefore, the evidence of the prosecution itself, as here, tends to show that the crime committed only amounts to manslaughter, the presumption of the existence of malice does not obtain.   When the evidence is in this condition the defendant may, if he chooses, take advantage of the case as made by the state and refrain from introducing any evidence. (*State* v. *Powell,* 54 Mont. 217, 169 Pac. 46.)   As pointed out above, the evidence justifying the conclusion that the defendant fired the shot unintentionally, the conviction of murder cannot be sustained.

Counsel for the defendant requested the court to withdraw [8]   from the jury consideration of the question whether the evidence made out a case of murder.   In view of the condition of the evidence, the request should have been granted.

Counsel requested the court to submit to the jury the question [9]   whether the defendant was insane at the time the shooting occurred.   The requested instructions embody correct statements of the rules of law applicable when the defendant relies upon insanity as a defense.   But we do not find any evidence in the record which required the question of defendant's mental condition to be submitted to the jury.   There is nothing in the statement of any witness which had any necessary tendency to show that the defendant was impelled by any insane delusion or by any irresistible impulse; nor, except so far as his reason had been clouded and obscured by the intoxication resulting from his indulgence in drink during the earlier hours of the day, that he did not understand what he was doing.   There was evidence tending to show that he suffered periodical attacks due to a diseased condition of his heart; but this did not tend to show that he was mentally irresponsible.   At the time of the

shooting he had become very much intoxicated—so much so that, according to his own testimony, he did not afterward remember what was going on about him or what he himself did. But this did not tend to show a diseased mental condition; nor could it be alleged as an excuse for an unlawful act committed by him while he was in that condition. (Rev. Codes, sec. 8114.) If there had been any substantial evidence pointing to the conclusion that he was affected by a mental disease, it would have been the duty of the court to submit the question of his mental capacity. As there was not, the requested instructions would not have served any purpose other than to confuse the jury.

Several other contentions are made by counsel; but, as they are without substantial merit, we deem it unnecessary to give them special notice.

The judgment and order are reversed, and the cause is remanded, with directions to grant the defendant a new trial.

*Reversed and remanded.*

MR. JUSTICE HOLLOWAY and MR. JUSTICE COOPER concur.