STATE, Respondent, *v.* CHAVEZ, Appellant.

(No. 6,507.)

(Submitted September 26, 1929. Decided October 10, 1929.)

[281 Pac. 352.]

Mr. *M. J. Doepker,* for Appellant, submitted a brief, and he and *Mr. W. B. Frame,* of Counsel, argued the cause orally.

Mr. *L. A. Foot,* Attorney General, and *Mr. L. V. Ketter,* Assistant Attorney General, for the State, submitted a brief; *Mr. Ketter* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, Enrique Chavez, was convicted of the crime of murder in the second degree and sentenced to a term in

the state prison. He appeals from the judgment and from an order denying him a new trial. The sole contention is that the judgment is contrary to law in that the evidence adduced warrants a verdict of guilty of no greater crime than manslaughter.

In support of this contention defendant relies solely upon *State* v. *Kuum*, 55 Mont. 436, 178 Pac. 288, wherein a judgment of conviction of murder in the second degree was reversed. In that case the evidence clearly disclosed that the fatal shot was accidentally fired during a friendly scuffle between the defendant and the deceased.

In the case at bar the deceased met his death by reason of being struck either by one of three bullets intentionally fired by the defendant into a small lighted room in which he knew three or four men were assembled, in reckless disregard of the safety of those men, or the deceased was struck by a bullet fired directly at him or at another with whom he was locked in close embrace at the time. No one, other than the defendant, was in a position to say which of these alternatives conformed to the truth.

The shooting occurred on the night of January 21, 1929, in a three-roomed house on Hopkins Street in Butte, rented by defendant and one Antone Ramos, and where the deceased, Juan Chavez, his cousin, had stayed with, and been kept by, the defendant for some days. Defendant had an injured foot but got around on crutches.

Shortly after 10 o'clock on the night of the tragedy, defendant appeared at a house next door to his residence and told the landlady, Mrs. Smith, and a roomer, Pedro Cruz, that Juan had been shot by some unknown person; his story to them, repeated later to police officers, was that he had been sleeping in the bedroom adjoining the kitchen when he was awakened by a shot and, going into the kitchen, he found Juan lying on the floor. Defendant requested Cruz to call a doctor; instead, Cruz called the police and then followed defendant to the scene of the shooting. Defendant handed Cruz a 38-caliber automatic pistol and requested him to take it away; he overcame Cruz's reluctance by assuring him that he, the defend-

ant, had "done nothing" with the pistol. Cruz took it to Mrs. Smith, who hid it. The defendant, and Ramos are Mexicans, as was also the deceased.

The officers, when they arrived, found Juan Chavez, with a bullet hole in his left temple, lying with his head in a pool of blood about a foot from the door communicating with the bedroom, his body extending in a northeasterly direction across the kitchen floor. They found three discharged shells on the floor of the bedroom, two cartridges in a stove in the third room of the house, and, in the pocket of a coat hung in the bedroom closet, the empty clip of an automatic. The pistol could not be found and both Mrs. Smith and Cruz denied knowledge of it; later the officers returned and told Mrs. Smith that the defendant had confessed to shooting his cousin and she thereupon produced the weapon; it had a cartridge in the barrel and was minus the clip; the clip, the empty shells and the cartridges found in defendant's home fitted the weapon. Juan Chavez was alive, but unconscious, when the officers arrived; he was taken to a hospital but died the next morning without regaining consciousness. Asked who was present at the time of the shooting, defendant told the officers that there had been three or four Mexicans in the kitchen but he did not know who they were.

The defendant was taken to the police station where he repeated the story of having been awakened by a shot, to police officers and to the county attorney. Finally he admitted to the county attorney that he had shot Juan, had taken the clip from the pistol and put it where it was found and then given the weapon to Cruz. Asked to detail the circumstances, his story, as told by the county attorney on the stand, was that he was asleep when his cousin came in with three or four fellows; that they were in the kitchen creating a disturbance, seemed mad at each other, and he called to them to get out but they paid no attention to him and then he heard a noise, something like a coffee-pot being thrown against the stove, and he took his pistol from under his pillow and shot "in different directions in the room," and while he was firing his cousin "apparently stuck his head in at the door and got hit." The county attorney

closed his direct testimony with the statement: "after questioning the defendant further—I said 'You shot your cousin because you were angry because he brought some other person into the house that you didn't want there,' and his answer was 'yes.'"

The record discloses that the defendant had but an imperfect knowledge of the English language, but the county attorney and police officers testified that he seemed to understand all questions put to him and to answer intelligently. At the trial he testified through an interpreter.

The defendant's story, as related on his direct examination, is that Juan brought three or four fellows to the house and they were making "a lot of noise" in the kitchen; that he called to them to get out but they did not go; that after he had ordered them out three times, he heard a noise that sounded like someone being choked and recognized the voice as that of his cousin, whereupon he took his gun out and fired three times "toward the door of the kitchen" in order to scare the men away and then heard somebody fall. He went into the kitchen and found that it was his cousin; the others had gone out, but two of them were still in the woodshed to the rear of the kitchen. He then took the clip from the gun and put it in the coat in the closet and went to the Smith house. He explained his original story to the police by saying that he was afraid to tell them what he had done for fear they would beat him up, but this statement does not explain his act in telling the same story to friends before the police arrived, and, on cross-examination, he admitted to the county attorney that he was not afraid of being "beaten up" when he told his original story to that officer.

On cross-examination he went further than on direct, stating that, just prior to firing the shots, Juan called for help and it was this call that he recognized as Juan's voice, rather than the choking noise.

Two Mexicans, claiming to have been two of the three present in the kitchen, testified that Juan was fighting with a third Mexican, one Siparno, who was choking him and that Juan did

call for help, whereupon the shots were fired from the bedroom and that, on the second or third shot, Juan staggered and fell to the floor.

Antone Ramos, the co-occupant of the house, testified that, on cleaning the kitchen the day after the shooting, he found two bullet holes in the north wall of the kitchen and that a skillet or griddle, which hung on that wall between the window and the partition between the kitchen and bedroom and which had been whole the day of the tragedy, was broken—pieces thereof on the floor and one or more of these in the blood which he cleaned up.

It is contended by counsel for defendant that the evidence as a whole, shows that a person lying on the bed, in the southwest corner of the bedroom, as defendant says he was, would be able to see only a portion of the north wall of the kitchen through the communicating door which was located at the north end of the partition between the two rooms and, therefore, could not have seen the combatants in the position in which they were placed by eye-witnesses and, consequently, the only way in which deceased could have been struck was by the bullet ricocheting from the griddle. After a careful study of the evidence, particularly the physical facts and circumstances brought out on the trial, we cannot say that this deduction is so clear that the evidence, taken as a whole, is sufficient to create a reasonable doubt of the existence of malice, under our law, such as would reduce the grade of the homicide to manslaughter.

The term "homicide" means merely "the killing of one human being by another" (*People* v. *Lee Look*, 137 Cal. 590, 70 Pac. 660); when the killing is with malice aforethought it is murder (sec. 10953, Rev. Codes 1921); if the killing is unlawful, but without malice, the homicide is manslaughter (sec. 10959, Id.; *State* v. *Sloan*, 22 Mont. 293, 56 Pac. 364). However, the malice which brands a homicide as murder may be express or implied (sec. 10954, Id.), and, on proof of the homicide by the defendant, in the absence of evidence tending to show that the act amounts only to manslaughter, or that

the defendant was justifiable or excusable, malice is presumed and the crime is presumed to be murder in the second degree. If the state would raise the crime to first degree murder, the burden rests upon the prosecution to show deliberation; on the other hand, if the defendant would reduce it to manslaughter, there must be evidence adduced by the defense, or appearing in the state's case, sufficient to raise a reasonable doubt in the minds of the jury as to the existence of malice. (Sec. 11980, Id.; *State* v. *Fisher,* 23 Mont. 540, 59 Pac. 919; *State* v. *Kuum,* above.)

It may be conceded that the defendant here had no express malice against his cousin; the evidence is that they were ''like brothers,'' and that little weight should be attached to his mere answer ''Yes'' to the question propounded to him by the county attorney: ''You shot your cousin because you were angry because he brought some other person into the house that you didn't want there''? But if the defendant intentionally shot at the assailant of his cousin and, by reason of poor marksmanship or of a sudden change in position of the combatants, his bullet so fired struck the deceased and caused his death, he would, nevertheless, be guilty as adjudged. (Sec. 10955, Rev. Codes 1921; *State* v. *Caterni,* 54 Mont. 456, 171 Pac. 284; *Territory* v. *Rowand,* 8 Mont. 110, 19 Pac. 595; s. c., 8 Mont. 432, 438, 20 Pac. 688, 690, 21 Pac. 19.) In the *Rowand Case* this court declared that ''the specific intent to take life accompanying the act of killing is an essential element of murder in the first degree. It is not necessary to constitute murder in the second degree; * * * that the killing was done unlawfully and with malice aforethought is all that is necessary to make it murder in the second degree.''

The record discloses that the room in which the tragedy occurred was but ten feet by twelve feet in size; which was the long and which the short distance is not disclosed. In this small room we are told stood a sink, a stove, either two or three tables and a number of chairs, and this little room showed no evidence of any struggle having been staged therein, although the evidence is that the deceased and Siparno fought for at least fifteen minutes so fiercely that two men could not

separate them. The testimony is that a man sitting at the *head* of the bed and looking through the door from the bedroom into the kitchen could see "the north wall of the kitchen; just see the end of the window." The window, or double window, was in the north wall and the "end" mentioned was but "two and one-half to three feet east from the partition that the door is in," yet the door was evidently not at the extreme north end of the partition, as "coming into the kitchen from the bedroom, as you go through the door into the kitchen, the stove and some dishes hanging there are on your right hand." Reconstructing the picture, the door must be a sufficient distance from the corner to give room for a stove of indefinite dimensions to set in not more than a three-foot space between the window and the corner, and still give access through the door into the room. The sink was located in the northeast corner of the kitchen and next to it, evidently against the east wall, stood a table.

The two witnesses who claim to have been present at the time, state that, just prior to the time the shots were fired, Siparno had forced Juan "against the table" and was choking him "and they started wrestling toward the window"; that at the time the shots were fired Juan was "close to the window" or "against the window," and his "left side was facing toward the door that leads into the bedroom."

The bedroom was also but ten by twelve, and, whether the greater distance was north and south, or east and west, with the communicating door not to exceed two feet from the north end of the partition, it would seem not only possible, but highly probable, that a man rising up in bed in the southwest corner of the bedroom, could see the men locked in a close embrace "close to" or "against" the window; they would be necessarily but a short distance from the door itself.

In addition to the doubt cast upon defendant's story by proof of his prior contradictory statements and discrepancies in his testimony on the stand, the jury may well have been influenced to disbelieve him by his rather remarkable answers given on cross-examination:

"Q. Your cousin was standing right in the doorway when you fired, wasn't he?" A. (By the Interpreter.) "He didn't see him."

"Q. If your cousin was standing in the doorway you would have seen him, wouldn't you?" A. "He was looking a little bit above the door and didn't see anybody standing in the doorway."

The deceased was, at the time he was shot, facing into the room; his left side was facing the door; he was struck in the left temple above the eye; the bullet ranged backward and downward through the brain and was found "resting against the bone on the right side toward the back of the head." A bullet ricocheting from the wall behind him might have struck him in the left temple, but could not .have taken the course it did.

Further doubt is thrown upon this theory by the fact that, while the griddle was in the courtroom, there was no attempt made to show where it had been struck by a bullet and it would seem that a heavy bullet from an automatic fired at a distance of not more than fifteen feet, on striking metal would have left indisputable evidence of the fact, and it may well be that the jury determined that the griddle had been broken in some other way than that now contended for by counsel.

Under all of the circumstances, the jurors were not compelled to believe the story told by the defense, or even that the defendant was at the head of the bed when he fired the fatal shot, and there is, in the record, substantial evidence to support the judgment, under the well-known rules laid down above. We are not permitted to substitute our judgment for that of the jury, and the judgment must, therefore, be affirmed.

Mr. Chief Justice Callaway and Associate Justices Galen, Ford and Angstman concur.