No. 12075

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

JERALENE HENRICH,

Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

John L. Adams, Jr. argued, Billings, Montana.

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana.
David V. Gliko, Assistant Attorney General, argued,
Helena, Montana.
Harold F. Hanser, County Attorney, Billings, Montana.
Clifford Schleusner, Deputy County Attorney, argued,
Billings, Montana.

---

Submitted: April 20, 1972

Decided: JUN - 8 1972

Filed: JUN - 8 1972

Thomas J. Kearney
Clerk

FILED

JUN 8 - 1972

Thomas J. Kearney
CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice John C. Harrison delivered the Opinion of the Court.

This is an appeal by the defendant, Jeralene Kye Henrich, from a judgment of conviction of involuntary manslaughter under the provisions of section 94-2507, R.C.M. 1947. The defendant was tried by a jury in the district court of the thirteenth judicial district, Yellowstone County, found guilty, and sentenced to serve two years in the Montana State Prison with one year suspended. From this judgment defendant appeals.

On January 11, 1971, the Billings, Montana fire department received a call requesting it to proceed to the home of the defendant. Upon arrival, Captain Benton Pattee found two year old Carl William Henrich, Jr. on the living room couch wrapped in a blanket. Defendant, the stepmother of the child, indicated to Captain Pattee that the child was having difficulty breathing. A resuscitator was applied to the boy which produced a mild response in the form of movement of the arms and hands.

Shortly thereafter, an ambulance arrived and took the boy to the family physician, Dr. Paul Crellin. Enroute, the ambulance's resuscitator was applied but without any further response.

Upon arrival at the doctor's office, Dr. Crellin administered mouth-to-mouth resuscitation without success. The boy never regained consciousness and was pronounced dead-on-arrival at St. Vincents Hospital.

Dr. Gordon Cox, a licensed physician and pathologist, performed an autopsy the following day. His findings and testimony revealed that the deceased had a rupture of the liver, "an actual transection of the liver" resulting in the liver being split into two parts; and a "large prominent fracture of the basal portion of the skull involving the right occipital bone".

Dr. Cox further testified:

" * * * the basal part of the skull is formed by one of the hardest bones in the body. It is very thick and well protected, as I mentioned, by soft tissue, and requires an extensive force to deliver an amount of force to this area which will fracture this bone."

The skull fracture was of sufficient severity to have caused death, but it was the doctor's opinion that death, in this case, resulted from massive hemorrhaging of the transected liver. The boy bled to death.

Regarding the liver injury, the doctor testified the force required to transect the liver "in this fashion" had to be a severe force and that a "direct force was required" here because the spleen, which is more susceptible to injury, was not ruptured.

On cross-examination, Dr. Cox indicated that his autopsy had not revealed any evidence of epilepsy in the boy, but his findings should not be regarded as conclusive in that respect. It was also the doctor's opinion that the skull fracture was not self-inflicted, such as a fall, because the child was not heavy enough to generate the force required to fracture the skull bone.

After the boy was pronounced dead, defendant made a statement to the Billings police and also testified at trial as to the events that took place on the morning of this unfortunate and tragic incident. It is defendant's uncontradicted, but also uncorroborated testimony that on the morning of January 11, 1971, she arose at 6:00 a.m. "to get my husband off to work". Since none of her three boys were awake when her husband left, defendant went back to bed. Around 9:20 a.m. she was awakened by her four year old son, Larry, who had been attempting to dress young Carl, the deceased. Defendant got up and discovered that Carl had "already messed his pants" so she took him into the bathroom where she partially cleaned him off and also spanked him with a twelve inch long stick. After spanking Carl, defendant "grabbed him by the arm and swung him around against the tub" and laid him over the side to facilitate cleaning of his bottom. Defendant then placed Carl on the toilet seat and left the bathroom. She testified thereafter:

> "I waited approximately 5 or 10 minutes and then I went back to check on him. I found Todd (Carl's nickname) sitting completely down on the stool but his arms were still holding him. I said, 'Todd sit up' but he wouldn't so I repeated it. Then I sat him up when he did not sit up alone. Then he fell back down in the stool. I sat him up again. He

fell into the stool again and I picked him up and put his hands on the stool and I let go and he fell completely off on the floor. I picked him up and stood him up and he fell again on the floor. Then I picked him up again and he fell again. I picked him up again, thinking he just lost his balance. I noticed then, that he wasn't doing it on purpose so I kept trying to stand him on his feet. His arms and legs were limp and he was real pale and his eyes rolled. I knew something was wrong so I started hitting him hard on the back first and then on his chest. I was doing this because I thought he had a temper tantrum and was holding his breath, he had a habit of holding it and I have spanked him for it. The last time he did this was 2 weeks ago. I took him out of the bathroom to the living room and laid him on the floor. I shook him and everything trying to bring him out of it. By everything, I mean I tried hitting quite hard trying to bring him out of it. When this did not help, I went outside and got some snow and put it on his face. He did not respond. He just tried to cry and gasped. I think he was trying to catch his breath, then I started shaking him and slapping his face again. Then I realized something was really wrong because I couldn't bring him out of it. I looked at him and his lips were turning blue and he was real white. Then I ran upstairs * * *."

She then ran to a neighbor's apartment and called the fire department.

Apparently, the episode in the bathroom had a twofold purpose: first, it was another session in defendant's frustrating attempt to potty-train Carl; and, second, it was punishment for "messing his pants." On cross-examination, defendant testified to the technique she had used when spanking Carl in the bathroom.

"I held both his ankles with one hand and just lifted him up, his head and back were still laying on the floor."

Dr. Cox testified in reference to the skull fracture:

" * * * the only conceivable way to do it is by using the child's weight as an advantage, in putting it in motion, and striking a hard object, and this is mostly done by swinging the child--".

Defendant produced several witnesses who all testified they had actual knowledge of the way defendant treated Carl and, in their opinion, defendant loved Carl and Carl loved the defendant. They had never witnessed any physical abuse of Carl by the defendant. These witnesses did say that during the times they had observed Carl, that occasionally he would go into

- 4 -

a type of trance or seizure; stiffen up and fall forward; moments later he would act normal again.

At the end of the trial but before settlement of instructions, several written questions were submitted by members of the jury to the court. Two of the questions were as follows:

1. The mother having three children to take care of should have been up and taking care of their needs earlier than 9:30. Why wasn't she up?

2. Why was the child not given medical treatment through welfare or free medical clinic if they felt the child was handicapped?

After the settlement of instructions and while the jury was deliberating, the jury submitted another question to the court: If we consider this an accident as per instruction number 27, is it then involuntary manslaughter?

In passing, we note that instruction No. 27 had been defendant's offered instruction No. 10. Therefore, no objection can be made by defendant to a question on her instructions.

On appeal, defendant has raised four issues for our review and consideration:

1. Whether evidence of defendant's striking and beating Carl was properly admitted under the pleadings.

2. Whether Carl's death was an accident within the purview of section 94-2511, R.C.M. 1947, thereby entitling defendant to an acquittal.

3. Whether the evidence was sufficient to support the verdict.

4. Whether the jury questions submitted to the court demonstrated that the jury was biased and guided by passion and prejudice in arriving at their verdict.

Proceeding to defendant's first issue, we find that she was charged by information with "wrongfully, unlawfully, and feloniously" killing Carl Henrich. It is defendant's contention that such a pleading is a specific pleading of involuntary manslaughter and, as such, precludes the admission

- 5 -

of any evidence which would tend to prove a charge of voluntary manslaughter. Specifically, defendant objects to the admission of testimony which alleges that she struck and beat her child. She contends that this evidence is evidence of intent and therefore evidence of a crime different from that with which she was charged.

There is no merit in this objection. All the evidence relating to defendant's "striking and beating" Carl was offered by her testimony and through her statement made to the Billings police on the day of the crime. The only evidence offered by the State in this regard was an _opinion_ of Dr. Cox as to how the skull fracture and liver injury _might_ have been inflicted. He testified on cross-examination there was no question as to what caused the injuries. It was not his educated guess, but his scientific opinion, that the death occurred from the beating given.

Defendant's second issue alleges that Carl's death was the result of an accident and, as such, is excusable homicide within the meaning of section 94-2511(1), R.C.M. 1947. That particular section provides that:

> "Homicide is excusable in the following cases:
>
> "1. When committed by accident or misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without unlawful intent."

Under this section, homicide is excusable if it is committed by accident while disciplining a child. However, such discipline must be executed with "usual and ordinary caution." Here, the evidence was sufficient to warrant the jury finding that such "usual and ordinary caution" was not exercised. Dr. Cox testified that in order to fracture the basal part of the skull, that "an extensive force" would be required because that bone is one of the hardest bones in the body in addition to being well protected by soft tissue. The doctor further testified that the trauma to the liver "had to be of severe force". The nature of the skull fracture and the liver injury would seem to rule out the possibility that "usual and ordinary caution" had been exercised.

In addition to the nature of the injuries here, we also have the testimony of the defendant which recites that she "swung" the child over the bathtub; that she hit him several times "quite hard"; and that she lifted him by his legs while in close proximity to the bathtub. Considering the evidence and the testimony admitted at trial, the question of whether or not the defendant exercised "usual and ordinary caution" within the meaning of section 94-2511(1), R.C.M. 1947, was one to be resolved solely by the jury. State v. Kuum, 55 Mont. 436, 178 P.2d 288.

Defendant also contends that the evidence was insufficient to support the verdict; that the criminal negligence of the defendant was never established. With this we cannot agree.

This Court has long held that the criminal agency of a defendant may be established by circumstantial evidence. State v. Kindle, 71 Mont. 58, 227 P. 65; State v. Cor, 144 Mont. 323, 396 P.2d 86.

Reviewing the evidence, we find that (1) Carl was in good health on the morning of January 11, 1971, (2) the defendant was the only adult in Carl's presence, (3) defendant admitted being angry with Carl for "messing his pants", (4) defendant grabbed Carl "by the arm and swung him around against the tub", (5) defendant hit Carl with a stick and her fists several times "quite hard", (6) Carl died shortly thereafter of injuries that required a "severe force" to inflict, and (7) it was extremely unlikely that those injuries could have been self-inflicted.

On the other hand, there is no reasonable evidence which would suggest that Carl died of injuries inflicted in some other fashion. There was an attempt by lay witnesses and the defendant to establish that Carl was subject to occasional momentary seizures where he would stiffen up and go into a trance. Apparently, this testimony was designed to suggest Carl was an epileptic or, at the very least, suffered from some unknown malady. However, there was no expert testimony in this regard.

It was also speculated that Carl could have fractured his skull on the toilet bowl rim when he slipped off the seat and while the defendant

was out of his presence.  Even if this is a reasonable hypothesis, Dr. Cox testified that Carl, who weighed between 25 and 30 lbs., could not have fallen down and fractured his skull.  " * * * the amount of force required to inflict this injury is much greater than 30 pounds."

It was also speculated that the liver injury could have resulted from Carl falling off of a chest of drawers and landing on the handlebars of a tricycle.  Dr. Cox also discounted this possibility as the height of the fall would not have been great enough to generate the force required to transect the liver.  In addition, there was no evidence that Carl had fallen in that manner either just prior to his death or any time before.

The evidence is sufficient to justify the jury's verdict.  There is an abundance of evidence, both direct and circumstantial, which would establish the defendant's criminal negligence in that the treatment or disciplinary action taken by the defendant was "without due caution or circumspection" within the meaning of section 94-2507(2), R.C.M. 1947. The nature and severity of the injuries indicate that the defendant's negligence was reckless and "such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or in other words, a disregard for human life or an indifference to consequences." State v. Powell, 114 Mont. 571, 576; 138 P.2d 949.

Defendant's last specification of error urges that the questions put to the court by members of the jury demonstrate  that the jury was biased and guided by passion and prejudice in arriving at their verdict. Again, we cannot agree.  The questions do not exhibit an affirmative showing of prejudice on the part of any juror as is required before error will be found.  State v. Winter, 129 Mont. 207, 285 P.2d 149; State v. Mott, 29 Mont. 292, 307, 74 P. 728.  The questions referred to do not demonstrate any preconceived prejudice toward the defendant before the evidence was presented; rather, they are reasonable reflections of perplexed jurors arising out of evidence presented at trial.  This does not

- 8 -

constitute reversible error.

For the foregoing reasons, the judgment is affirmed.

_____
Associate Justice

We concur:

_____
Chief Justice

_____

_____

_____
Associate Justice

- 9 -