STATE, Respondent, *v.* CATES, Appellant.

(No. 7,224.)

(Submitted May 4, 1934. Decided June 4, 1934.)

[33 Pac. (2d) 578.]

174

*Mr. W. E. Kelley, Mr. W. T. Boone* and *Mr. E. F. Gummer,* for Appellant, submitted an original and a reply brief; Mr. *Keeley* and *Mr. Boone* argued the cause orally.

178

Mr. *Raymond T. Nagle,* Attorney General, Mr. *C. J. Dousman,* Assistant Attorney General, and Mr. *Donovan Worden,* County Attorney of Missoula County, for the State, submitted a brief; Mr. *Dousman* and Mr. *Worden* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

The defendant by verdict of the jury was found guilty of murder in the first degree and by judgment of the court sentenced to be hanged. His motion for a new trial was denied, and this appeal is taken from the judgment and the order denying the motion.

The defendant admitted the homicide and attempted to justify it on the ground of self-defense.

The Missoula courthouse and the jail are the only structures located in a city block in the city of Missoula which is bounded on the west by Woody Street. The courthouse is located approximately in the middle of the block; the jail in the northwest corner. About a quarter to 9 o'clock on the evening of July 21, 1933, an automobile was observed by witnesses for the state to proceed very slowly along Woody Street in a northerly direction. When it reached a point about midway of the courthouse block, it stopped. The defendant was in the driver's seat in this automobile. Paul Read, the deceased, was standing on the running-board on the right-hand side of the car, with the front door open and with his head inside

the doorway, so that it appeared to witnesses 75 feet distant from where the automobile stopped, and who were viewing it toward its left-hand side, as though two persons were occupying the front seat of the car. Shortly after it stopped —from a minute and a half to two minutes—two shots were fired within the automobile. The defendant then got out and proceeded along the left-hand side of the car to the rear. The deceased had proceeded to the rear right-hand corner of the automobile. When the defendant came around the rear end of the car, according to five witnesses who testified on behalf of the state, the deceased started to run in a crouching position toward the courthouse, and defendant shot at him while deceased was thus running with his back turned toward the defendant. At a point 59 feet from the automobile the deceased fell to the ground. The defendant returned to his seat in the car, sat down and immediately got out again. In the meantime he was approached by the witness Harlow, a constable, who placed him under arrest. The sheriff, who was walking from the jail, took charge of defendant. At all times after defendant first left the automobile he had a .38-caliber automatic pistol in his hand. Some of the witnesses for the state testified to having heard three shots only; others testified to having heard four. Subsequently that evening three empty shells were found in close proximity to the automobile and a fourth on the front seat, the shells being identical in size and make with those found in the clip of defendant's pistol. The deceased was removed in an ambulance to a hospital, where he died on the night of the shooting, at about 11 o'clock. He was suffering from two bullet wounds. Following his death, Dr. Thornton performed an autopsy on his body. As a witness he testified concerning the result of the autopsy, with reference to the wounds.

The deceased, immediately after falling on the courthouse lawn, complained of something hurting him. In his hip pocket a witness found a flashlight, which was removed. The witness Harlow made the following inquiry of the deceased, "Paul, where is your gun?" to which deceased responded, "I didn't

have any.'' At the time in question the deceased was, and for some time prior thereto had been, a prohibition enforcement officer.

Witnesses testified as to their making a search for a gun around the defendant's automobile and on the courthouse lawn where the shooting occurred, and testified that none was found. In his right hand the deceased had keys which, while in the ambulance taking him to the hospital, he delivered to one of the witnesses, and which were found to be the keys to the defendant's car. An examination of the car, by removing the lining on the inside of the right-hand front door, revealed that a bullet had passed through the lining, but had not passed through the metal portion of the door. A bullet was found lying inside this lining in the door. A further examination of the car revealed that a bullet had passed through a portion of the post between the rear door and the window back of the rear door on the right-hand side of the car and through the glass of the window. Witnesses testified that from the appearance of the bullet hole through the window they were able to determine that the bullet had passed from the inside of the car out, rather than from the outside in.

The defendant testified that for some time he had been engaged in the business of ''bootlegging'' and had paid a fine for the violation of both the national and state prohibition laws; that for some time prior to the homicide he had been paying to the deceased the sum of $50 a month, and that at the time of the shooting he owed the deceased under this arrangement $120; that on the evening in question, in response to a solicitation over the telephone, he left his home about 8:30 and went into the alley to the rear of the Oxford poolhall; that he walked down the alley from his car, came back and went into the back door of the Oxford, but did not see the man who had called him on the telephone; that he then discovered sitting in the front seat of the car a pasteboard carton which contained within it a paper bag, and inside the bag a jug of moonshine whisky; that he started to back his car out of the alley, and at this point the deceased opened

the car door and turned his flashlight in the defendant's face; that the deceased had a gun in his hand and said to defendant, "Back out of here"; that deceased did not tell defendant that he was under arrest and did not look into the car for anything; that from this point on the deceased directed him in the movement of his car. He testified further that deceased demanded $100, and that he (defendant) protested that he had less than $10 in his pocket, and that he had to remove his wife from the hospital that morning because of lack of funds to keep her there; that the deceased said, "We will go to the sheriff's office," to which the defendant responded, "That is fine with me. But you remember you took money from me before my wife and kid." Defendant then testified that deceased then said, "What are you going to do? Are you going to come through with this?" to which defendant responded that he could not come through and had nothing to come through with; that defendant then said, "We will go to the sheriff's office and I will tell them what you are pulling," to which deceased replied, "I can kill you and say you were resisting arrest," at which point, defendant states, the deceased struck at him with the gun, and that he caught it. The defendant testified that, after the car was stopped, the deceased struck at him; that defendant grabbed his own gun and shot from the seat as the deceased was backing out of the car; that, when the deceased stuck up his head along back toward the rear of the car, the defendant threw up the gun and snapped back there; that defendant walked around toward the back of the car; and that the deceased was down by the rear wheel and "had his gun in his hand pointed toward the front right door of the car that was open, and as soon as I seen him I shot him."

The witness Frazier testified on behalf of the defendant that at the intersection of Broadway and Woody Street, about half a block from the scene of the shooting, he saw Cates driving his car; that there was a man whom he did not know standing on the running-board and leaning in the car; that the man had something in his hand; that "it looked like a

gun to me; I took it to be a gun apparently pointed within the car.''

Florence Hoffman, a sixteen year old girl, came down Woody Street between 8:30 and 9 o'clock and noticed a large crowd assembled around the courthouse lawn. She testified that her escort, a soldier at Fort Missoula, who was since discharged from the Army and had departed to parts unknown, went over to the crowd to see what was happening, and that as he went over to the crowd ''a gentleman walked across the street, and he stooped down and picked up something that resembled a gun.''

The remaining facts will be discussed in connection with the treatment of the specifications of error.

The court instructed the jury as to the degrees of murder and manslaughter, and with reference to the law of self-defense.

The defendant contends that on the trial of this case the corpus delicti was not proved. It is his contention that there was no proof, or at least insufficient proof, to establish that the deceased died as a result of the bullet wounds which he received on the night in question. On the trial of a murder or manslaughter case it is incumbent upon the state to prove the fact of the death of the deceased by direct evidence, and the fact that death came about through a criminal agency, by direct or circumstantial evidence, but beyond a reasonable doubt. (Sec. 10962, Rev. Codes, 1921; *State* v. *Kindle,* 71 Mont. 58, 227 Pac. 65; *State* v. *Riggs,* 61 Mont. 25, 201 Pac. 272; *State* v. *Dixson,* 80 Mont. 181, 260 Pac. 138.)

The wife of the deceased testified that she was at the hospital following the removal of the deceased thereto, and remained with him until his death, which occurred after 11 o'clock and before midnight of the day in question. Dr. Thornton testified that the day following he performed an autopsy on the body of the deceased. He said that the subject was a strong, healthy appearing male from thirty to thirty-five years of age, and, after describing the bullet wounds in detail and other conditions which he observed, expressed his opinion as a

physician as follows: "I would say that the shock and hemorrhage was the cause of his death. That was induced by the bullet wound through the body." He further testified that Read died about 11 o'clock on the night of July 21, and that when he first saw him he was in a dying condition. There is no suggestion that Read might have died as a result of any other cause than the bullet wound. The *corpus delicti* was within the decisions of this court, sufficiently established.

The defendant urges by appropriate specification of error ▪ that the state failed to prove venue, or that the homicide was committed in Missoula county, where the case was tried. The venue must be proved beyond a reasonable doubt, as any other fact. (*State* v. *Keeland,* 39 Mont. 506, 104 Pac. 513; *State* v. *Ducolon,* 60 Mont. 594, 201 Pac. 267.) The witness McLean, who was the jailer at the Missoula county jail and there on the evening the shooting occurred, testified that he heard the shots, which sounded like the noise of the back fire of an automobile; that he saw the sheriff walk over to the defendant's car; that he saw the deceased lying on the lawn of the courthouse and heard him groaning and yelling; that he later ascertained the identity of the deceased, and that likewise the man in the automobile was the defendant; and that the defendant was brought over to the jail and locked in a cell. He testified in conclusion as follows: "The location of this whole procedure is in Missoula county, State of Montana." It appears from the testimony of numerous witnesses that they observed the shooting in Missoula, Montana.

Subdivision 2 of section 10532, Revised Codes 1921, provides that courts take judicial notice of "whatever is established by law." Section 4335, Id., establishes and defines the boundaries of Missoula county and designates the city of Missoula as its county seat. This court has long recognized the rule that the facts which are enumerated and classified in section 10532 may not be extended by judicial construction. (*Commonwealth Public Service Co.* v. *City of Deer Lodge,* 96 Mont. 48, 29 Pac. (2d) 667.) The courts of this state will take judicial notice that Missoula is the county seat of Missoula

190

county, and that it is located within its boundaries. (*People* v. *Etting,* 99 Cal. 577, 34 Pac. 237; *People* v. *Faust,* 113 Cal. 172, 45 Pac. 261; *State* v. *Buralli,* 27 Nev. 41, 71 Pac. 532.) There is no intimation contained in the record that the homicide occurred elsewhere than in Missoula county. Accordingly, venue was established beyond a reasonable doubt.

The record discloses that at the close of the state's case a ▉ request was made by the state that the jury be taken to view the automobile of the defendant and the premises where the shooting occurred. The court suggested that it thought it would be better to have the view occur at the conclusion of all the testimony. After the close of the testimony, the county attorney informed the court that he was prepared to produce the automobile for view by the jury. The bailiff was sworn to take charge of the jury to view the automobile and the scene of the shooting. The county attorney was designated by the court to attend the view on behalf of the state, and one of his attorneys in behalf of the defendant. The court directed the bailiff to permit no conversation at the view, and informed him that all that could be done was merely to point out the location and the property. The court further admonished the bailiff and the jury that no conversations or discussions were to occur whatever.

The record, in reciting the proceedings of the trial, is silent as to whether the defendant attended the view.. Subsequently to the making of the motion for new trial and the hearing of the same, and before its decision, affidavits were filed which disclosed beyond question that the defendant was not present at the time the automobile and premises were viewed by the jury. It is nowhere suggested, either in the record or in the affidavits referred to, that the defendant ever made a request that he be permitted to attend; nor did the court indicate that this right was refused to the defendant. It appears that during the progress of the view the defendant remained in the courtroom in the custody of the sheriff.

The trial court in the certificate settling the bill of exceptions recited that the affidavits mentioned were in no way

considered by the court in the deciding of the motion for a new trial; that they were never called to its attention by anyone on behalf of the defendant; that they were filed three days after the time granted by the court in which to file affidavits had expired; that no request or leave to file these affidavits was granted by the court; that they were called to its attention by the clerk after the argument of the motion for new trial, but that neither of the affidavits was presented to the court for its consideration.

Defendant urges, under appropriate specifications of error, that his failure to attend the viewing of the automobile and the premises was prejudicial error. The pertinent portion of section 11996, Revised Codes 1921, provides: ''When in the opinion of the court it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, * * * it may order the jury to be conducted in a body in the custody of the sheriff and in the presence of the defendant and his counsel to the place which must be shown to them by a person appointed by the court for that purpose, * * * and the sheriff must be sworn to suffer no person to speak to or communicate with the jury, nor to do so himself on any subject connected with the trial, and return them into the court. * * * ''

Without deciding whether the affidavits disclosing the fact that the defendant was not present at the view were properly before the court and should have been considered by it, we will, for the purpose of this appeal and the decision of the question at hand, treat the record as disclosing properly the facts contained in the affidavits.

The research of counsel and our own research have failed to disclose any statute in a sister state which provides that the view shall be made in the presence of the defendant and his counsel. It is generally held, in the absence of statute, by the great majority of cases, that the right of a person on trial for a crime to be present at a view of the premises where the alleged crime was committed is recognized, and that any

proceedings on the part of the court which deprives him of his right against his consent is error. The authorities supporting the foregoing view are collated in the note in 30 A. L. R. 1358. The precise question here, however, is whether the defendant may waive the right to accompany the jury in viewing the premises, and whether this right was waived by the conduct of the defendant in this case.

The question has arisen frequently in other jurisdictions—as to whether this right may be waived—it being asserted in those cases that the constitutional right of the defendant to be present at the trial and meet the witnesses against him face to face was violated. The courts have reached different conclusions upon the solution of this question. In the main, the difference in the result attained by the various courts depends upon whether or not the view of the premises is determined to be the taking or receiving of testimony in the case. If the court answers the question in the affirmative, namely, that a view of the premises is a taking of testimony, then it is held that the defendant may not waive the right to be present at the view. (*Noell* v. *Commonwealth,* 135 Va. 600, 115 S. E. 679, 30 A. L. R. 1345.) On the other hand, if the court determines that the view of the premises is not the taking or receiving of testimony, then it is held that the defendant may, by failure to make request to attend the view, waive the right to be present at the view.

This court, in discussing the purpose of the statute with reference to a view of the premises in a civil action (sec. 9350, Rev. Codes 1921), in the case of *Ferris* v. *McNally,* 45 Mont. 20, 121 Pac. 889, 894, said: "The purpose of the provision is to enable the jury to apply the testimony of the witnesses to the observed conditions about which they have spoken, and also to determine the truth of statements made by them with reference to these conditions. (*Ormund* v. *Granite Mountain Min. Co.,* 11 Mont. 303, 28 Pac. 289.)" Again this court in the case of *State* v. *Landry,* 29 Mont. 218, 74 Pac. 418, 421, speaking with reference to a view under the statute now being considered—the view of property by the jury in a criminal

case—said: "What they see and learn, though it may be used in connection with evidence of witnesses heard in the court-room, is to enable them to understand and apply the evidence heard, or to be heard, in the presence of the accused, and in open court. (*Ormund* v. *Granite Mountain Min. Co.*, 11 Mont. 303, 28 Pac. 289.)" In that case the jury was ordered to inspect two animals, but in fact they inspected three, and were permitted to observe their behavior. The court observed: "From this source the jury also received evidence out of court which must have been prejudicial." Again it was said: "They should not be permitted during the inspection to make experiments, to be used by them as independent testimony in determining the rights of the parties."

These decisions of this court clearly demonstrate that the view of the premises must not be conducted in such a manner as to amount to the taking of testimony.

The supreme court of Washington, in the case of *State* v. *Lee Doon,* 7 Wash. 308, 34 Pac. 1103, 1104, said with reference to the view of the premises in a criminal case: "The jury does not view the premises for the purpose of obtaining evidence. No evidence is allowed to be offered there to the jury, under any rules or any circumstances. They simply view the premises for the purpose of enabling them to make an intelligent application of the testimony presented at the trial."

The Nevada court, in the case of *State* v. *Hartley,* 22 Nev. 342, 40 Pac. 372, 375, 28 L. R. A. 33, speaking on this subject, said that "the view is not taking evidence in the case, and is not intended to be so, but simply to enable the jury the better to understand the testimony given in court."

The highest court of the state of New York, in the case of *People* v. *Thorn,* 156 N. Y. 286, 50 N. E. 947, 951, 42 L. R. A. 368, in discussing the question, said: "But the sole purpose and object of the view is to enable the jurors to more accurately understand and more fully appreciate the testimony of witnesses given before them."

The supreme court of Utah, in considering the same question, said: "The view, therefore, cannot be construed as designed

for the purpose of taking testimony, within the meaning of the Constitution, but for the sole object of enabling the jurors the better and more fully to appreciate, and the more accurately to understand, weigh, and apply the statements of persons who testified before them as witnesses." (*State* v. *Mortensen*, 26 Utah, 312, 73 Pac. 562, 572, 633.)

It is uniformly held that, where a view by the jury does not amount to the taking of evidence, the accused may waive his right to be present by failing to make timely request to attend. (*State* v. *Lee Doon*, supra; *State* v. *Hartley*, supra; *People* v. *Thorn*, supra; *State* v. *Mortensen*, supra; *Haynes* v. *State*, 71 Fla. 585, 72 So. 180; *State* v. *Slorah*, 118 Me. 203, 106 Atl. 768, 4 A. L. R. 1256; *Elias* v. *Territory*, 9 Ariz. 1, 76 Pac. 605, 11 Ann. Cas. 1153; *State* v. *Suber*, 89 S. C. 100, 71 S. E. 466; *Jenkins* v. *State*, 22 Wyo. 34, 134 Pac. 260, 135 Pac. 749; *State* v. *Ah Lee*, 8 Or. 214.) The rule is approved and declared to be sound by the following text-writers: 3 Wigmore on Evidence, 2d ed., sec. 1803; 1 Greenleaf on Evidence, 16th ed., sec. 162; Underhill on Criminal Evidence, 3d ed., sec. 365.

There is no suggestion either in the aforementioned affidavits nor anywhere in this record that anything occurred on the view that was improper or prejudicial to the rights of the defendant. Independent of the question of waiver, we are unable to see wherein he suffered the loss of a valuable right, as was so aptly observed by the supreme court of Oregon in the case of *State* v. *Ah Lee*, supra, wherein it was said: "We are unable to see what good his presence would do, as he could neither ask nor answer any questions, nor in any way interfere with the acts, observations, or conclusions of the jury. He would have been only a mute spectator while he was there." (See, also, *Elias* v. *Territory*, supra.)

Defendant urged that the trial court was in error in permitting a view of the automobile, by reason of the fact that no proper foundation had been laid for a view, in that it nowhere appears in the record that the automobile at the time of the view was in the same condition as it was at the time of the homicide on July 21, 1933. It is also argued in

support of this contention that it does appear from the record that the lining from the front door on the right-hand side of the automobile had been loosened.

The view was had without any objection on the part of the defendant on any ground whatsoever. This court has frequently held that, by the failure of a defendant to object or assert a right in the trial court, he waives his right to secure a review on appeal of the action of the trial court. This court will not reverse a case because the court failed to give certain special instructions when none covering the point were requested. (*State* v. *Reed,* 65 Mont. 51, 210 Pac. 756.) The error, if any, committed by the trial court, in instructing the jury orally at the close of its instructions as to their conduct in the jury-room and the form of the verdict, is waived by the failure to make timely objection. (*State* v. *Lewis,* 52 Mont. 495, 159 Pac. 415.) Where the defendant failed to object to the introduction of a glove for comparison with another glove thereafter to be produced and which later was not offered, and made no request to have the exhibit withdrawn, the defendant was held to be in no position on appeal to complain of the introduction of the glove. (*State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270.) The failure of the defendant to object to cross-examination by the state of its own witness barred defendant on appeal from urging error in that respect. (*State* v. *Clark,* 87 Mont. 416, 288 Pac. 186.) The rule is the same with reference to the admission of testimony without objection. (*State* v. *Hill,* 46 Mont. 24, 126 Pac. 41.) Also with reference to the conduct of the court in propounding an improper question to a witness. (*State* v. *Richardson,* 69 Mont. 400, 222 Pac. 418.) Furthermore, the ordering of a view was within the discretion of the trial court (*State* v. *Arnold,* 84 Mont. 348, 275 Pac. 757); and, as there was no misconduct claimed on the part of the jury or others at the viewing, we cannot say from the record in this cause that the court abused its discretion in making the order.

It is contended on behalf of defendant that he is entitled to a reversal of the judgment, as the record does not dis-

close that he was present at the time the verdict of the jury was received.

The court minutes of October 11, 1933, disclose that the trial opened with the defendant present; witnesses were examined in behalf of the defendant and in rebuttal; the jury viewed the premises, received their instructions, and, after argument, they retired to deliberate upon their verdict and returned their verdict on that day. The bill of exceptions covering the proceedings of the trial states that the court resumed at 9:30 o'clock A. M., the defendant being present in person; that at 10:30 o'clock A. M. the court recessed for the purpose of settling instructions, and resumed at 11:44 o'clock A. M., when the defendant was present in person; that the instructions were then read, and that the court recessed at 12:20 o'clock; that, when the trial resumed at 1:30 o'clock, the defendant was present in person; and that the cause was then argued by counsel, whereupon the jury, at the conclusion of the argument, retired to deliberate upon their verdict.

Counsel for defendant rely upon the case of *State* v. *Reed*, supra, in support of their contention. There the case began on May 27, continued on May 28, and finally came to a close on May 31. During the various days of the trial the minutes of the court did not show the defendant present at any time. The record only disclosed his presence while he was testifying and while he was listening to the testimony of some four witnesses.

A similar contention was made in the case of *State* v. *Hall*, 55 Mont. 182, 175 Pac. 267. There the court minutes for one day of the trial recited that the jury was instructed, the case was argued and submitted, the jury retired and considered of their verdict and returned their verdict into court. The clerk only once mentioned therein that the defendant was present. The court held that the fair construction of the language was that the defendant was present at all these proceedings, and that his contention was without merit.

Furthermore, there is nothing in the record affirmatively to show that the defendant was absent when the verdict was

returned, nor was an attempt made to incorporate such a showing in the record. Chapter 136, Laws of 1931, provides, in substance, that on an appeal such as this, unless the record on appeal affirmatively shows the contrary, it shall be conclusively deemed that the defendant was present in court at all stages of the trial. Accordingly, the contention is without merit.

Error is assigned upon the permitting of the jury, without the consent of the defendant, to take with them into the jury-room during their deliberations certain exhibits. These exhibits were photographs of the car, taken in various positions, photographs of the body of the deceased, the gun or pistol taken from the defendant after the shooting, the flashlight found on the body of the deceased, revolver clips, part of a bullet, and the jug of moonshine whisky found in the car of the defendant at the time of the homicide. All these exhibits had been offered and were received in evidence during the progress of the trial. No objection to this procedure is found in the record. It is silent as to any court order permitting the exhibits to be taken to the jury-room. The defendant did not consent affirmatively to the submission of the exhibits to the jury. The fact that the exhibits were taken to the jury-room upon the retirement of the jury for deliberation is made to appear by the affidavit of one of defendant's counsel, filed on motion for new trial. The affidavit does not purport to state that the court made no order permitting the exhibits to be taken to the jury-room. Where the defendant consents to the exhibits being taken to the jury-room, no error results. (*State* v. *Allen*, 23 Mont. 118, 57 Pac. 725.)

By the provisions of section 12011, Revised Codes 1921, the court may, in its discretion, submit to the jury, during their deliberations, papers, other than depositions, which have been received as evidence in the cause. In the case of *Territory* v. *Doyle*, 7 Mont. 245, 14 Pac. 671, it was held that, in the absence of a prohibitory statute, the court, in its discretion, could submit exhibits to the jury.

The exhibits in question here were not among those enumerated in section 12011, supra. No showing was made that there was anything about the particular exhibits which would furnish to the jury any other information than that which had already been obtained from the same articles exhibited to them during the trial. We do not think that prejudice can be implied from the fact that these particular exhibits were left in the possession of the jury in the jury-room. Our view finds support in the following cases: *People* v. *Herrera,* 32 Cal. App. 610, 163 Pac. 879; *State* v. *Riley,* 41 Utah, 225, 126 Pac. 294; *White* v. *State,* 20 Okl. Cr. 182, 201 Pac. 522. We think the foregoing authorities announce the better rule—one in accord with our section 12125, which provides that this court must give judgment without regard to technical errors or defects which do not affect the substantial rights of the parties. But authority may be found taking the contrary view. (*McCoy* v. *State,* 78 Ga. 490, 3 S. E. 768.)

It is urged that the trial court erred in the admission of ▉ ▉ certain photographs of the automobile, taken the day following the shooting, over the objection that they were incompetent and immaterial, and that, as to one of them, it was not the best evidence. The best evidence rule is applied to attempted substitution of parol for documentary evidence. "Indeed, the term 'best evidence' has been described as a convenient short designation of the rule as to the proving the contents of a writing." (2 Jones on Evidence, sec. 756, p. 1463; Thayers, Pret. Tr. on Evidence, 497.) "Best evidence is not synonymous with primary evidence." (Jones on Evidence, supra.)

The photographer who took the photographs identified them, and testified that they correctly represented the subject being photographed, which, as testified by other witnesses, was the defendant's automobile in which the shooting occurred. The objection did not go to the question argued; namely, that it was not shown that the automobile was in the same condition on July 22, 1933, as it was on the evening of the preceding day. The objection that the offered exhibits were incompetent and

immaterial would indicate that they were improper in any event, not merely that they were improper at the time of the offer for lack of sufficient foundation. This and similar objections are unavailing unless the offered evidence is obviously improper. (Jones on Evidence, 2d ed., sec. 2520; *State* v. *Black,* 15 Mont. 143, 38 Pac. 674.)

The witness Winters was called in rebuttal by the state. He was likewise a prohibition enforcement officer and had worked with Paul Read for the preceding two years. Over the objection that the testimony was incompetent, irrelevant, immaterial and not proper rebuttal, he was permitted to testify that two years before the deceased had borrowed $100 from him, which the latter had never been able to repay; that at different times witness had financed the deceased in amounts of from $10 to $20 with which to make official business trips; that deceased had been unable to repay those amounts until the receipt of his next check; and that deceased's financial condition was not good.

Mrs. Read, the widow of the deceased, over like objection, was permitted to testify that her husband was rather deeply in debt and had been having a hard time to pay his debts, and was unable to do so.

This testimony was admitted upon the theory that it tended to rebut the testimony as to the payments which the defendant stated he had been making to Paul Read amounting to $50 a month.

In many criminal cases the financial condition of the defendant, both before and after the crime charged, has been held properly admissible (*State* v. *Lucey,* 24 Mont. 295, 61 Pac. 994; *Van Wyk* v. *People,* 45 Colo. 1, 99 Pac. 1009; *State* v. *Mortensen,* supra; *State* v. *Allen,* 23 Idaho, 772, 131 Pac. 1112; *State* v. *Wintzingerode,* 9 Or. 160; *People* v. *Leung Ock,* 141 Cal. 323, 74 Pac. 986; *State* v. *Gruber,* 19 Idaho, 692, 115 Pac. 1; *State* v. *Humphrey,* 63 Or. 540, 128 Pac. 824); also, where it was generally known that a woman, murdered in the course of a robbery, had money, that fact was held to be admissible. (*Musser* v. *State,* 157 Ind. 423, 61 N. E. 1).

200

Rebuttal evidence need not completely and entirely contradict the evidence of the defense. It is admissible if it has a tendency to contradict or disprove it. (See generally *State* v. *McNeil*, 53 Nev. 428, 4 Pac. (2d) 889; *Mitchell* v. *State*, 133 Ala. 65, 32 So. 132; *State* v. *Nordstrom*, 7 Wash. 506, 35 Pac. 382; *State* v. *Carabajal*, 26 N. M. 384, 193 Pac. 406, 17 A. L. R. 1098; *People* v. *Emerson*, 130 Cal. 562, 62 Pac. 1069; *Silk* v. *United States*, (C. C. A.) 16 Fed. (2d) 568; 16 C. J. 867.)

The defendant testified, as a part of his case in chief, to the making of the payments of $50 a month to the deceased without any objection on the part of the state. The testimony called in question by defendant has some tendency to destroy or contradict that given by him, and we cannot say that the court was in error in admitting this evidence.

The defendant contends that the evidence was insufficient to sustain conviction of murder in the first degree. This court in the case of *State* v. *Fisher*, 23 Mont. 540, 59 Pac. 919, 920, said: "If the killing was unlawful only, manslaughter is the crime; add to the element of unlawfulness malice aforethought only, and murder of the second degree is the crime; and, lastly, add deliberation to unlawfulness and malice aforethought, and murder of the first degree is the crime." (See, also, *State* v. *Chavez*, 85 Mont. 544, 281 Pac. 352.) Therefore, in order to sustain a conviction of murder in the first degree, the burden rested upon the state to establish, not only the killing by the defendant, but also the presence of deliberation and premeditation. (*State* v. *Gunn*, 85 Mont. 553, 281 Pac. 757; *State* v. *Kuum*, 55 Mont. 436, 178 Pac. 288; *State* v. *Colbert*, 58 Mont. 584, 194 Pac. 145.)

The defendant contends that, because there was no evidence of previous ill-feeling existing between the defendant and the deceased prior to the time of the killing, or evidence of threats, the record is barren of any proof of premeditation or deliberation. In the case of *State* v. *Vettere*, 76 Mont. 574, 248 Pac. 179, 184, it was said: "Counsel assumes that there should be evidence tending expressly to show the deliberate purpose; but this is not necessary. * * * It is generally to be inferred

from facts and circumstances attending the killing." The supreme court of New Mexico, in the case of *State* v. *Rodriguez,* 23 N. M. 156, 167 Pac. 426, 434, L. R. A. 1918A, 1016, said: "It is well settled that, if the intent to take life is executed after deliberation and premeditation, though but for a moment or an instant, the crime may be murder in the first degree."

The purpose to kill may be formed the moment before it is executed as well as for an hour or a day, and still the act be premeditated. (*State* v. *Speyer,* 207 Mo. 540, 106 S. W. 505, 14 L. R. A. (n. s.) 836.) It is said in 1 Wharton on Criminal Law, twelfth edition, section 420: "Deliberation and premeditation being established, the length of time it existed is immaterial; the homicide will be murder."

The evidence discloses, and it is conceded by the defendant, that following the meeting of himself and the deceased they proceeded slowly in the automobile for a distance of several hundred feet. The car stopped. After the lapse of one and a half or two minutes, the first shot was fired. The defendant fired the last shot at the deceased, according to the testimony of five eye-witnesses, and after the deceased had started to run away from the defendant. Witnesses testified that the latter immediately following the shooting appeared to be calm and cool. The defendant himself testified that, when he shot, he shot at the body of the deceased; that he knew where to hit him. From these facts it appears that the defendant was shooting with a deliberate design and purpose; namely, to kill.

The defendant urges in this connection that his testimony to the effect that he was shooting in self-defense, believing himself to be in danger, is not denied. True, it was not directly denied; but it did appear from the evidence that the deceased was the owner of two pistols, one of which was found to be locked up in his car, and the other to be at his home at the time of the shooting. Witnesses searched the premises about the automobile and the scene of the shooting, but found no gun. None was found on the deceased when he fell on the courthouse lawn. When interrogated on the subject, the de-

ceased himself said that he had no gun. If the jury did not believe the testimony of the defendant and the other witness who testified that he thought the deceased had a gun in his hand as the automobile was proceeding up Woody Street, they were warranted, in the light of these facts and circumstances, in disregarding it. (*State* v. *Grimsley,* 96 Mont. 327, 30 Pac. (2d) 85; *State* v. *Fisher,* supra.)

It is also urged that, because the defendant was resisting arrest and killed the deceased while so resisting, the crime was no greater than manslaughter. The state urges in response to this contention that defendant is in no position to raise the question, since no instructions were requested or given covering the law relative to the rights of the defendant in resisting an unlawful arrest.

One of the grounds of the motion for new trial was that the verdict is contrary to the evidence. The defendant is therefore in a position to question the sufficiency of the evidence to support the verdict of the jury in the respect contended. (*State* v. *Gunn,* 85 Mont. 553, 281 Pac. 757.) As stated above, the jury had a right to disbelieve the testimony of the defendant that the deceased had a gun, and by their verdict they have said that they disbelieve the defendant's testimony in that respect and in respect to self-defense. In order to invoke the rule for which the defendant contends, there must be evidence, not only that there was an illegal arrest, but that the killing was done in actual resistance to the act of making the arrest or maintaining the illegal custody of the defendant. It cannot be admitted that a person who is merely formally restrained can respond by shooting to death the officer and escape the charge of murder on the ground that he was protecting his liberty from illegal restraint. When the arrest is made by a known officer and nothing is to be apprehended beyond a temporary detention in jail, resistance obviously cannot be carried to the extent of taking life. (2 R. C. L. 474; *People* v. *Gilman,* 47 Cal. App. 118, 190 Pac. 205; *Roberson* v. *State,* 43 Fla. 156, 29 So. 535, 52 L. R. A. 751; *State* v. *Meyers,* 57 Or. 50, 110 Pac. 407, 33 L. R. A. (n. s.) 143.) The rule for which

defendant contends is without application here, under the facts.

We find no reversible error in the record. The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS and STEWART concur.

MR. JUSTICE ANGSTMAN: I concur in the result but not with all that is said in the foregoing opinion.

I think the court erred in overruling defendant's objection to evidence showing that deceased had borrowed money from Winters, and to evidence produced by Winters and Mrs. Read as to the financial condition of the deceased and his inability to pay his debts. In my opinion, this evidence did not rebut or have any tendency to contradict or refute the testimony of defendant that he paid to deceased $50 per month. As well might it be held that in an action for money lent, where defendant claimed that he had made payment, the plaintiff might rebut the charge of payment by showing his (the plaintiff's) impoverished financial condition and his inability to meet his debts.

In *Burke* v. *Kaley*, 138 Mass. 464, plaintiff sued defendant for money loaned to defendant's intestate during his last illness. Defendant sought to show the improbability that deceased had borrowed the money by showing that, when the purported loan was made by plaintiff, the deceased had $4,000 in a savings bank, and that during his illness he drew from the bank sufficient money to pay all his expenses. The court held that such evidence was properly excluded, saying: "The facts that the defendant's intestate had money in two savings banks, and that he drew out enough to pay his expenses, do not necessarily tend to prove any of the issues in the case. To admit them might open the door to a wide range of inquiry upon collateral issues."

The fact that deceased owed bills and borrowed money does not tend to refute the claim that defendant paid him $50 per month any more than that evidence of defendant's insolvency

would prove that he had not made the payments. The Supreme Court of the United States, in the case of *First Nat. Bank* v. *Stewart*, 114 U. S. 224, 5 Sup. Ct. 845, 849, 29 L. Ed. 101, in discussing this question, said: "It further appears by the bill of exceptions that the plaintiff in error offered evidence to prove that for more than a year previous to his death McMillan had been 'hopelessly insolvent,' and had experienced 'great difficulty in procuring means to meet his interest obligations.' The defendants in error objected to this evidence. It was ruled out, and the plaintiff in error now assigns its exclusion as error. The purpose of the evidence was to prove that McMillan had not furnished the money to pay his note for $2,600 held by Hyde. The evidence offered was inadmissible because too remote and conjectural. The law requires an open and visible connection between the principal and evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences. (Citing cases.) * * * The evidence offered in the present case was too weak and vague to contribute to an intelligent decision by the jury of the question in issue, namely, whether McMillan had paid his note. It is common for both solvent and insolvent men to pay some of their debts and to leave some unpaid. Proof of the insolvency of a debtor is no more competent to show nonpayment than proof of his solvency is competent to show the payment of his debts. These two kinds of proof stand on the same footing. The latter kind has been held to be incompetent. (*Hilton* v. *Scarborough*, 5 Gray [Mass.] 422.) The insolvency and pecuniary embarrassment of a person may be shown as evidence that he has not paid all his debts; but they do not tend to show that he has not paid a particular debt. We think the evidence of the insolvency of McMillan was properly excluded."

The cases cited in the majority opinion holding that the financial condition of the defendant is sometimes admissible are not in point here.

I am able to agree with the result reached in the foregoing opinion, because I think the error in admitting the evidence

in this case, under the facts here shown, was harmless. The rule is that, "where it is quite clear that irrelevant, immaterial or incompetent evidence has neither misled nor prejudiced the jury, a new trial may be refused." (46 C. J. 113; and see *Church* v. *Zywert*, 58 Mont. 102, 190 Pac. 291.) Under the command of section 12125, Revised Codes 1921, this court on appeal "must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties."

The incompetent evidence, improperly admitted as I believe, related to a collateral matter. Whether defendant did or did not pay deceased $50 per month, as claimed by him, had no bearing upon the question of his guilt or innocence of the crime of murder in the first degree. It is unbelievable that the jurors, having a proper regard for their oath, were at all influenced in arriving at the verdict of guilty of murder in the first degree, by the evidence relating to the financial condition of the deceased.

Rehearing denied June 20, 1934.