No. 13839

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

THURMAN JERREL MUSGROVE,

Defendant and Appellant.

Appeal from: District Court of the Fourth Judicial District,
Hon. Jack L. Green, Judge presiding.

Counsel of Record:

For Appellant:

Garrity and Keegan, Helena, Montana
Donald A. Garrity argued, Helena, Montana
James R. Gillespie, San Antonio, Texas

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Denny Moreen argued, Assistant Attorney General, Helena,
 Montana
John S. Henson appeared, County Attorney, Superior,
 Montana
Dennis Lind appeared, Missoula, Montana

Submitted: April 20, 1978

Decided: AUG 1   1978

Filed: AUG 1   1978

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Defendant, Thurman J. Musgrove, was charged with the crime of deliberate homicide, a felony, in the District Court, Fourth Judicial District, Mineral County, arising out of the death of John Linker, at Tarkio, Montana, on May 7, 1976. Defendant entered his plea of not guilty of the charge. He was tried in the District Court, before a jury, and on February 5, 1977, a verdict was returned finding the defendant guilty of mitigated deliberate homicide. Defendant moved for a new trial which was denied on March 8, 1977 by the District Court. The Court entered a judgment of conviction on March 8, 1977 and fixed a sentence of imprisonment for a term of 20 years. From the judgment and order denying his motion for new trial, defendant appeals.

Defendant resided at the time herein involved in Superior, Montana. On May 7, 1976, he had gone to Missoula to do some shopping and while there, had purchased a Model 37, Smith and Wesson revolver, with some ammunition for the gun. On his return to Superior from the shopping trip, he had stopped in the late afternoon at a bar near the outskirts of Missoula and had some drinks. He then continued on his way until he came to Tarkio, where he stopped at the Tarkio Corner Bar. He arrived there at approximately 6:50 p.m.

When defendant entered the Tarkio Corner Bar, there were several patrons in the place. He took a seat near the middle of the bar, ordered a drink and while there, showed the revolver, which he had loaded earlier and placed in his pants pocket, to the bartender. The bartender returned the revolver to defendant without comment, and defendant returned the gun to his pocket.

Sometime later, John Linker, a large and boisterous man with a reputation for antisocial behavior in bars, entered and

-2-

took a place on a barstool next to the defendant. Linker immediately began to bewail the fate of his brother, who was in jail. The defendant offered to use his influence to obtain the release of Linker's brother. Linker loudly spurned this offer, and belittled any influence defendant might have.

The parties continued ordering drinks and consuming them. At best, John Linker was not a pleasant drinking companion. He offered to shake dice with the bartender for the cost of supplying the music box, but the bartender refused. Defendant entered into such gambling with Linker, and Linker, in rolling the dice, rolled them off the bar. After Linker had inserted coins in the music box, he loudly complained to the bartender the music was not loud enough. Throughout, he continued to taunt defendant about his offer to aid Linker's brother.

Eventually, defendant found it necessary to go to the restroom. When he came out, he found that Tom Wheeler, Jr. the son of one of the patrons of the bar, was performing a feat of magic for the other patrons, making an egg disappear. Linker loudly observed he could find the egg and began to "pat down" young Wheeler in his search for the egg. Defendant told Linker he was "acting like a cop" in patting down Wheeler, which remark set off another barrage of verbal abuse from Linker. The parties resumed their seats on the bar stools, where the argument continued. Suddenly, the parties were engaged in a scuffle at the bar.

The evidence regarding the fight is conflicting. Defendent testified Linker attacked him and took out his gun and fired a warning shot but Linker, nevertheless came after him and struck him several times. In the course of the

-3-

struggle, defendant fired four shots, two of which struck Linker. Nevertheless, the fight continued with Linker eventually wrapping his hands around Musgrove's gun hand in such a manner as to turn the gun toward Musgrove, Linker stating that he would kill Musgrove with his own gun. Defendant also contended Linker was using a pen knife on the defendant. In the course of the scuffle, the bartender, Ben Poat, was able to retrieve the gun after the shots had been fired.

When the scuffle ended, Linker was lying on the floor mortally wounded. He died on the way to the hospital.

On appeal, defendant lists six issues for review:

(1) The conduct of the jury view was improper.

(2) The comments of the county attorney in closing arguments were improper and unethical.

(3) Certain instructions were improper.

(4) Statements made by the defendant following the incident were improperly executed evidence.

(5) The court reporter failed to take down the voir dire of the jury and error occurred in the voir dire process.

(6) The evidence does not support the conviction.

One of the principal issues raised by the defendant in his motion for new trial in the District Court, was that the jury view of the premises where the alleged crime was committed was improperly conducted. An examination of the record is necessary to understand the factual background for this issue.

At the close of the state's case, the Court allowed the jury to view the premises in question. It instructed the jury before they departed for the view as follows:

> "Now ladies and gentlemen of the jury, there has
> been a request that you be taken to view the
> scene of this incident and you will be conducted
> under the charge of some bailiffs and a party
> from each side to view the scene.

"Mr. Henson will represent the state and Mr.
Gillespie will represent the defendant. While
absent from the Court no person will speak
to you on any subject connected with this
trial except that the parties designated
by the Court to accompany you may point
out the places in issue.

"The purpose of your viewing the scene is
to enable you to better understand and
apply the testimony of the witnesses and
the exhibits that have been or may be
offered during the trial."

What happened when the jury viewed the scene is best

described by referring to the affidavits that were produced

by the defendant in support of his motion for a new trial.

The affidavit of James Gillespie indicated that he was a

San Antonio lawyer who had been hired to represent the

defendant in the cause. He stated:

"At or about 1:00 o'clock p.m. we boarded a Superior
school bus and proceeded to the scene of the
tragedy, namely, the Tarkio Bar, in Tarkio,
Montana. We all entered the Bar, and by all,
I mean the jurors, Deputy Sheriff Becker, Mr.
Timietti, the County Attorney, Mr. John Henson
and this Affiant. Deputy Sheriff Becker stood
behind the Bar, and the jurors viewed the
interior of this Bar, which is an elongated
trailer converted into a Bar-Lounge type of business.
During the course of the Jury View, several
questions were asked by the Jury, and Mr.
Henson answered these questions. By way
of example, there have been testimony as to
where Mr. Hollenbeck had been sitting, where
Mr. Tom Wheeler, Sr., was sitting, with
respect to the locations of Mr. Musgrove
and Mr. Linker. Mr. Henson answered these
questions, indicating the end of the Bar
as to where Mr. Wheeler was sitting, and
a Mr. Hollenbeck was sitting at a 90 degree
angle to him, at the edge of the Bar, and
that a little ways down, in front of where
Deputy Sheriff Becker was standing was where
Mr. Truman Musgrove was seated, and either
in the stool next to him, or one away, was
where Mr. Linker was. A Lady Juror also
asked if that was the juke box at which
Mr. Tom Wheeler, Jr. was playing during the
course of the incident. Also, questions
were asked as to the clock and the hole
in the wall at the far end of the trailer,
where obviously a clock had been struck
by a bullet, and the bullet had gone
into the far wall. These questions were

answered by County Attorney Henson, as response
to questions by members of the Jury.

"The last question that I can recall that was
asked of Mr. Henson was in which direction
was Mr. Linker's body on the floor, and Mr.
Henson replied and pointed out the area on
the floor where Mr. Linker's body was.  One
question was propounded of this Affiant, and
the Affiant responded that he thought it
would be best to refer the question to the
Court for answering.  On another occasion,
Mr. Henson likewise made the same response;
however, he had already answered numerous
questions propounded to him by members of
the Jury.  After this, Mr. Henson and I
decided it would be best if we let the
Jury view the trailer without our presence.
* * * "

The affidavit of John Henson, the county attorney,

is not in substantial variance with that of Mr. Gillespie

as to what happened:

" * * *

"That the view of the premises by
the jury had been discussed previously
with counsel for the defense, Donald
Garrity and James Gillespie, and also
with the presiding Judge, District Judge
Jack L. Green.

"That during previous discussions, counsel
for the defense and the State had discussed
having one defense counsel and one member
of the prosecution accompany the jury and
bailiff to view the scene and point out
the physical evidence (bullet holes, position
of witnesses, etc.) to the jury as presented
in the State's case in chief.

"That prior to meeting in chambers with the Court,
James Gillespie, counsel for the defendant,
inquired of affiant, 'does the defendant have
to go out there?', to which affiant replied
'We won't require it if he doesn't want to.'
This occurred at the presence of the defendant
and in the presence of Donald Garrity, counsel
for the defendant.

"That in Chambers counsel for the defendant and the
prosecution discussed with Judge Green their
previous discussions; that it was agreed in
Chambers that the defendant would not be
required to attend the view of the premises.

"That it was agreed in Chambers that one member
of the prosecution, and one defense counsel
would accompany the jury and bailiff to view
the premises, and that they could point out
the physical evidence to the jury, and

-6-

Court so ordered.

"That affiant and James Gillespie, counsel for the defendant, secluded themselves from the jury in the rear of the bus that was used to transport the jury to premises.

"That immediately after entering the premises, several jurors pointed out bullet holes and asked affiant and James Gillespie if these were the bullet holes and affiant replied that they were the ones described.

"That several jurors likewise inquired of affiant and James Gillespie as to the location of the witnesses, defendant, and the deceased as set forth in State's case in chief; that affiant advised the jurors that they were correct, that their determinations were in accordance with the evidence as presented in the State's case in chief.

"That a juror asked a question of affiant directly that did not concern the physical evidence and affiant advised him he would have to take that up with the Court; that a juror likewise directed a question that did not concern the physical evidence to Mr. Gillespie and he responded as affiant had to refer the question to the Court."

The controlling section with respect to a view by the jury of the place of offense is section 95-1912, R.C.M. 1947. That section provides:

"When the court deems it proper that the jury view any place or personal property pertinent to the case, it will order the jury to be conducted in a body under the custody of the sheriff or bailiff, to view said place or personal property in the presence of the defendant and his counsel. The place or personal property will be shown them by a person appointed by the court for that purpose, and they may personally inspect the same. The sheriff or bailiff must be sworn to suffer no person to speak or otherwise communicate with the jury nor to do so himself on any subject connected with the trial, and to return them into the courtroom without unnecessary delay or at a specified time as the court may direct."

It is clear that the mandate of section 95-1912, that no person should speak or otherwise communicate with the

jury on any subject connected with the trial, was not complied with in this case. A fair reading of the affidavits presented by the two attorneys shows that the proceedings that occurred at the jury view constituted the taking of testimony. The defendant was not present. He has a constitutional right to be present at all stages of the trial, and to meet his witnesses against him face to face. Article II, Section 24, 1972 Constitution of Montana.

But the State contends that the defendant waived his right to be present at the jury view of the place of events and that therefore, he waived whatever occurred there, citing State v. Cates (1934), 97 Mont. 173, 33 P.2d 578. It is true State v. Cates does hold that the defendant may waive his right to be present at the jury view, but that holding is expressly conditioned to those cases where "a view by the jury does not amount to the taking of evidence", 97 Mont. at 194, 33 P.2d at 583. Again it is stated in State v. Cates that:

> "These decisions of this court clearly
> demonstrate that the view of the premises
> must not be conducted in such a manner as
> to amount to the taking of testimony."
> 97 Mont. at 193, 33 P.2d at 583.

Waiver is defined as the voluntary abandonment of a known right. 28 Am Jur 2d 836, Estoppel and Waiver, Part 2, §154. It cannot be claimed that the waiver by the defendant through his counsel to be absent during the view by the jury included a waiver of proceedings occurring at the jury view which amounted to a taking of testimony, unsworn testimony at that, in the absence of the defendant. For that reason, although a defendant may waive his right to be present when the jury is viewing the premises (State v. Cates, supra.) in this case, his waiver did not extend to what occurred outside the the command of the statute while the jury was viewing the premises.

-8-

The prejudicial effect to the defendant of the improper and contra-statutory conduct occurring at the jury view is beyond our measure, except to know that it requires reversal. We so hold.

The second issue raised by defendant is that certain portions of the argument of the county attorney in summation were improper. Again we look at the record:

> " * * * He said he was accidently (sic) shot once in his chest at approximately a 45-degree angle upwards, accidentally; accidentally shot once in the leg and accidently (sic) shot or creased once in the side, which is probably the bullet that went into the clock because of it's upward angle. * * *

> "MR. GARRITY: I don't believe there is any evidence as to the angle of the bullet on the burn.

> "MR. HENSON: I don't believe there is any to the contrary either.

> "THE COURT: This is a matter for the jury. I will overrule the objection."

A few minutes later, in the State's final argument, the following occurred:

> " * * * We told you that we were going to give you every shred of evidence that we had, whether it was good or bad because we were convinced that all the evidence would convince you beyond a reasonable doubt the defendant was responsible for the death of John Linker.

> "Now, we have kept our bargain. And after hearing all this testimony, I'm convinced that Musgrove is a liar and he is responsible.

> "MR. GARRITY: Objection, your Honor. That's testimony by the attorney and is improper argument and in violation of the Canons of Ethics of the American Bar Association's Standard of Justice.

> "THE COURT: Well, I will sustain the objection.

> "MR. GARRITY: I would ask that the jury be admonished, Your Honor, to disregard that statement.

-9-

"THE COURT: Well, I will admonish the
jury that they are the judges of the
evidence, the credibility of the witnesses
and whatever any counsel may think of the
testimony or a witness is not controlling
or does not have any bearing on them in
their deliberations."

Since we have determined that this case must be reversed,
it is proper for us to examine those statements for guidance
in the next trial of this cause. The Canons of Professional
Ethics were adopted by this Court on April 25, 1973, and
appear in full in Volume 160, Mont.Rep. Disciplinary Rule
No. 7-106(C)(3)(4) provides:

"In appearing in his professional capacity
before a court, a lawyer shall not:

" * * *

"(3) Assert his personal knowledge of the facts
in issue, except when testifying as a witness.

"(4) Assert his personal opinion as to the
justness of a cause, as to the credibility
of a witness, as to the culpability of a
civil litigant, or as to the guilt or
innocence of an accused; but he may argue,
on his analysis of the evidence, for any
position or conclusion with respect to the
matter stated herein."

The first statement of the prosecuter that we have
quoted above appears to be based on his analysis of the
evidence and is a matter on which he could properly argue.
Therefore no improprieties exist with respect to that
portion of the closing argument. However, with respect to
the second portion of the argument which we have quoted above,
the prosecutor is expressing his personal opinion as to the
guilt or innocence of the accused and it is therefore highly
improper. Whether the subsequent admonition by the trial
court was sufficient to remove the prejudicial effect as to
the defendant is something we are not now called upon to
determine, since we have already found we must reverse
this case. It is well for attorneys to remember that while

-10-

in closing argument, they may argue and comment upon the law of the case in the instructions, as well as upon the evidence of the case, Section 95-1910(f), R.C.M. 1947, that statutory permission is not unlimited. The provisions set forth in the disciplinary rule which we have quoted above are solemnly based upon the law developed in the cases and need no greater elaboration. It is enough to say that in most instances, it is highly improper for an attorney in final argument to characterize the testimony of a witness as lies or the party or a witness himself as a liar. See: People v. Tarpley (Mich. 1976), 199 N.W.2nd 839.

We look next at the issue raised with respect to the propriety of the instructions, and discuss them with the right to retrial of this case.

The trial court refused defendant's proposed instruction no. 13 which reads as follows:

> "If upon a fair and impartial consideration of
> all the evidence in the case, the jury find
> that there are two reasonable theories supported
> by the testimony in the case, and that one
> of such theories is consistent with the theory
> that the defendant is guilty as charged in
> the indictment, and the other is consistent
> with the innocence of the defendant, then
> it is the policy of the law, and the law
> makes it the duty of the jury, to adopt
> that theory which is consistent with the
> innocence of the defendant, and to find
> the defendant 'Not guilty'."

That proposed instruction comes out of the decision of this Court in State v. Riggs (1921), 61 Mont. 25, 201 P. 272. However, that case was one where the conviction depended entirely upon circumstantial evidence. The instruction has no place in a case such as this, where the essential elements of the crime charged are found in the direct evidence of witnesses. Direct evidence differs from circumstantial evidence in that in the former, witnesses

-11-

testify directly of their own knowledge of the main fact or facts to be proven, while in the case of circumstantial evidence, the proof of certain facts and certain sanctions of a given case depends upon the inference that the jury makes from some other connected facts which usually and reasonably follow according to the common experience of mankind. State v. Riggs, supra., 61 Mont. at 53, 201 P. at 282.

The defendant also objected to two instructions given by the Court which related to presumptions that the jury may indulge in. One was instruction no. 10 as follows:

> "If you find that the defendant, Thurman J. Musgrove, committed a homicide and no circumstances of mitigation, excuse or justification appear, then you may infer that the homicide was committed knowingly and purposely."

In Court's instruction no. 11, with respect to whether or not the defendant acted knowingly and purposely as required to convict him, the Court instructed in part:

> "Any required mental state need not be proved by direct evidence, but may be inferred from acts, conduct and circumstances appearing in evidence. The law also presumes that a person intends the ordinary consequences of any voluntary act committed by him. This presumption, however, is termed a disputable presumption and may be controverted by other evidence."

The first instruction, no. 10, is based upon the provisions of section 95-3004, R.C.M. 1947. It was a necessary statutory enactment, and is a proper instruction to the jury, for thereby the jury is informed that it need not have direct evidence of the mental processes of the defendant, but that his acts in the circumstances surrounding the event may be looked to, to determine his knowledge and purpose. Likewise, court's instruction no. 11, and that portion of it quoted above, is proper under the statement of this Court in State v. McLeod (1957), 131 Mont.

-12-

478, 489, 311 P.2d 400, 406:

> "Here the evidence is undisputed that the
> defendant shot Thomas Pablo twice, critically
> wounding him.  The repeated shooting into
> the vital parts of the body of a live human
> being with a deadly weapon is evidence that
> the gun was used intentionally and deliberately
> and demonstrates the intent to kill.  With
> this fact established, the law presumes that
> the defendant was sane at the time he committed
> the act; that defendant committed the unlawful
> act with an unlawful intent, and that defendant
> intended the ordinary consequences of his
> voluntary act.  R.C.M. 1947, Section 93-1301-
> 7, subds. 1, 2 and 3.  These are rebuttable
> presumptions.   * * *"

Moreover, we hold that the giving of such instruction does not contravene the presumption of defendant's innocence, nor transfer the burden of proof as to his innocence to the defendant.

The other issues raised by the defendant can be disposed of quickly.  We have examined the statements attributed to the defendant following the shooting and at the time of his arrest, as testified to by the witnesses at the trial, and we find each of those statements properly admitted by the Court.

Further, this Court will not consider issues which are not based upon a record to which the appellate court can look.  For that reason, the lack of record of the voir dire examination of the jury would have compelled us to ignore that issue raised by the defendant.  See: State ex rel. Woodahl v. District Court (1975), 167 Mont. 514, 518, 540 P.2d 312, 314.  Moreover, it appears that counsel waived the reporter's record in this case.  For that reason, we do not consider the claim of bias of one of the jurors as arguable, but rely on the discretion of the District Court in allowing the juror to sit.

Finally, because we are reversing this case, on other grounds, it is not necessary for us to consider the sufficiency

-13-

of the evidence to justify the verdict which was returned.

For the reasons stated above, this cause is reversed and remanded to the District Court for further proceedings.

_____
Justice

We Concur:

_____
Chief Justice

_____
Justice

_____
Judge Robert Holter
District Judge

Mr. Justice John Conway Harrison dissenting:

I dissent.

I believe that allowing the county attorney to speak at the jury view was error. However, I do not believe his answering a few limited questions prejudiced the rights of defendant in any way. As a result, I would affirm the conviction.

The comments made by the county attorney at the jury view came after testimony had been received in the courtroom regarding the positions of the bar patrons, the body, and the bullet holes. All of this had been explained and diagrammed in detail by the State's witnesses. Defendant's contention at trial was that he had used reasonable force and acted in self-defense. The matters clarified at the jury view were never in dispute. In fact, defense counsel did not object to the jury view procedure either before or after the jury view. He raised the issue for the first time after the conviction on a motion for new trial.

It is true defendant was not present at the jury view. But his absence did not deprive him of his constitutional right to confront the witnesses against him. Defendant did not demand or even ask to be present. This Court held in State v. Cates (1934), 97 Mont. 173, 33 P.2d 578, that a defendant may waive his right to be present at a jury view by not objecting if the jury view does not amount to the taking of testimony. Here, the statements made by the county attorney could not be classified as the taking of testimony. The county attorney merely confirmed that the jury's observations were in accord with the testimony of prior witnesses;

testimony which, of course, was taken at the trial in the presence of the defendant.

                              _John Conway Harrison_
                              Justice

Honorable Robert M. Holter, District Judge, dissenting:

I concur in the dissent of Mr. Justice John C. Harrison, but with these additions.

First, compare the pointing out of undisputed locations of persons and objects in this case with State v. Davison, (1977), _____Mont._____, 568 P.2d 159, 34 St.Rep. 916, wherein this Court held that to secure reversal defendant must show he was prejudiced by the jury's consideration of unoffered and unadmitted exhibits. Under the Davison ruling, there could be no reversal here since the physical locations pointed out by the county attorney to the jury were undisputed by the defendant. Again, the defense is self-defense.

Second, regarding improper closing argument of counsel, the majority does not indicate they would reverse for clearly improper argument. On the other hand, they do not say they would not reverse, either. It would be helpful for this Court to make that decision for future guidance of trial courts.

Improper argument in this case should not be cause for reversal, in the absence of a clear showing the outcome was affected. The trial judge handled the situation well, and there is no reason to believe the jury disregarded the judge's instructions.

Counsel for either side of litigation, whether plaintiff

or defendant and whether the litigation is criminal or civil, should be punished for transgressions of the magnitude here. Parties themselves should not be put to greater burden because of such transgressions unless they participated therein or it is clearly shown to have influenced the outcome.

_____
Honorable Robert M. Holter, District Judge, sitting for Mr. Justice Daly.